PEOPLE v GRAY

Docket No. 106442. Argued December 11, 1997 (Calendar No. 13). Decided May 5, 1998.

Allen L. Gray pleaded nolo contendere in the Dickinson Circuit Court, John D. Payant, J., to one count of kidnapping and two counts of third-degree criminal sexual conduct, conditioned on his right to appeal the trial court's refusal to preclude his in-court identification by the victim. The Court of Appeals, T. G. KAVANAGH, P.J., and R. B. BURNS and G. S. ALLEN, JJ., affirmed in an unpublished memorandum opinion, finding that the trial court's conclusion that there were sufficiently independent grounds for an in-court identification was not clearly erroneous (Docket No. 171212). The defendant appeals.

In a unanimous opinion by Justice CAVANAGH, the Supreme Court *held*:

The trial court did not err in denying the defendant's motion to suppress the victim's in-court identification. The victim had a sufficiently independent basis for the identification.

1. A photographic identification procedure violates a defendant's right to due process of law when it is so impermissibly suggestive that it gives rise to a substantial likelihood of misidentification. Subjective intent does not eliminate substantial likelihood of misidentification. Only the effects of, rather than the causes for, preidentification encounters should be determinative of whether confrontations were unduly suggestive.

2. The trial court did not err in denying the defendant's motion to suppress the victim's in-court identification. The victim had a sufficiently independent basis for her in-court identification. In particular, she had more than sufficient opportunity to observe her assailant, and she identified the defendant as her assailant in a corporal lineup before she was shown the suggestive photograph. While the victim was not one hundred percent positive at the lineup, she was sufficiently certain to be able to pick out the defendant. Any evidence of the victim's lack of certainty would be relevant to the weight that the evidence should be given, but not to its admissibility.

Affirmed.

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, *Jeffrey G. Paupore*, Prosecuting Attorney, and *Carole F. Barnett-Stopper* and *Charles D. Hackney*, Assistant Attorneys General, for the people.

State Appellate Defender (by *Corinne Beckwith Yates*) for the defendant.

CAVANAGH, J. Defendant pleaded nolo contendere to one count of kidnapping and two counts of CSC III. Defendant's plea was conditioned on his right to appeal several issues, including the trial court's refusal to preclude the victim's in-court identification of him. The propriety of the identification is now before this Court.

I

On April 6, 1993, at approximately 4:30 A.M., the victim drove to the Econo Foods supermarket in Iron Mountain, Michigan, in order to pick up doughnuts for the guests of the Super Eight Motel. After coming out of the supermarket, the victim was abducted by a man hiding in the back seat of her car. The man brandished a knife and instructed the victim to drive to a secluded spot along a dirt road, where he ordered her to climb into the back seat. The man then forced the victim to disrobe, to kiss him on the lips, and to perform oral sex. Shortly thereafter, the headlights of a police car appeared behind the victim's car. The man instructed the victim to put her shirt back on, climb back into the front seat, and drive away from the area.

After driving around for a while, the man instructed the victim to park along a residential street in Iron

Mountain and once again had her climb into the back seat. This time he forced the victim to perform oral and vaginal intercourse. He then had her drive to a point near a gas station where he got out of the car. The victim returned to the Super Eight Motel and reported the incident to the police. She described her attacker as an unshaven, dark complexioned white man of medium build, about six feet tall, forty to fifty years old, with uncombed, dirty dishwater blond hair and odd looking lips. He had been drinking, smelled bad, and smoked a darker than normal cigarette.

The defendant ultimately became the prime suspect. The police took defendant into custody and arranged a corporal lineup.[1] The victim tentatively identified the defendant as her assailant at the lineup. She made the following statement after the lineup:

> I was called at 2:00 P.M. to come down to look at a lineup. I looked at eight people. Number six looked like him, but I can't be sure. His eyes and face fit, but his lips were what threw me off. His eyes really look like the eyes I remember. I can't be positive, but there is something about his eyes and face.

The police arrested and charged defendant with one count of kidnapping[2] and two counts of third-degree CSC[3] after the lineup. Later that evening, Officer Revord went to the victim's home to inform her that the police had arrested a suspect. During the visit, Officer Revord showed the victim a single photograph of the defendant. After seeing the photo-

---

[1] Defendant was represented by counsel at the corporal lineup. However, the attorney at the lineup was not the same person who served as trial counsel.

[2] MCL 750.349; MSA 28.581.

[3] MCL 750.520d; MSA 28.788(4).

graph, she became sure that defendant was the one who attacked her. As she testified at the hearing on defendant's motion to suppress the identification:

> When I was relaxed after the line-up and I was at home, Officer Revord came over and he showed me the picture and it was at that time that I had no doubts that it was him.

The trial court denied a motion by defendant to prohibit an in-court identification of defendant by the victim, holding that although the use of the photograph by Officer Revord was improper, there was a sufficiently independent basis for the victim to identify Mr. Gray at trial. Pursuant to his plea agreement, defendant appealed the denial of his motion. The Court of Appeals declined to overturn the trial court, stating that the trial court's conclusion that there were sufficiently independent grounds for an in-court identification was not clearly erroneous.[4] We granted leave to appeal.

II

Defendant challenges the photographic identification procedure used by Officer Revord. He argues that Officer Revord impermissibly suggested to the victim that defendant was her assailant when he showed her a single photograph of defendant and told her that he was the man they had arrested in connection with her assault.

---

[4] Defendant also challenged his initial arrest on the ground that it constituted entrapment. The Court of Appeals held that the trial court's ruling that defendant was not entrapped was not clearly erroneous. The entrapment issue is not before this Court.

A photographic identification procedure violates a defendant's right to due process of law[5] when it is so impermissibly suggestive that it gives rise to a substantial likelihood of misidentification. *People v Kurylczyk*, 443 Mich 289, 302; 505 NW2d 528 (1993); *Simmons v United States*, 390 US 377, 384; 88 S Ct 967; 19 L Ed 2d 1247 (1968). In *People v Anderson*, 389 Mich 155, 178; 205 NW2d 461 (1973), we noted that an improper suggestion often arises when "the witness when called by the police or prosecution either is told or believes that the police have apprehended the right person." Moreover, when "the witness is shown only one person or a group in which one person is singled out in some way, he is tempted to presume that he is the person." *Id.*

In the present case, Officer Revord went to the victim's residence, informed her that they had arrested the defendant, and showed her a single color photograph of the defendant. The display of the single photograph, combined with the statement that this was the man the police had arrested for the assault, was highly suggestive. To begin with, the exhibition of a single photograph "is one of the most suggestive photographic identification procedures that can be used." Sobel, *Eyewitness Identification* (2d ed), § 5.3(f), p 5-42. This was accompanied by a statement from Officer Revord implicating the defendant as the assailant. Thus, the photographic showing in this case presented the exact situation warned of in *Anderson*: The defendant was singled out by showing only one photo to the victim, and then the victim was reassured that defendant was her assailant because of

---

[5] US Const, Am XIV; Const 1963, art 1, § 17.

the statement by a police officer that this was the man the police believed was her assailant.

Although the suggestive photographic identification procedure in this case occurred after a legitimate corporal lineup, this case still presents the danger that once the identity of the victim's assailant was suggested to her through the photographic identification procedure, she "may be likely to base later identifications of the suspect upon that photograph, rather than on [her] recollection of the crime." *Kurylczyk*, 443 Mich 321 (opinion of BRICKLEY, J.). As the United States Court of Appeals for the Second Circuit explained in *Jarrett v Headley*, 802 F2d 34, 41 (CA 2, 1986):

> *When the witness's initial identification of the accused has been tentative and his later identifications are "positively certain," there may be a question as to whether the newfound certainty resulted from impermissibly suggestive law enforcement procedures. Solomon v Smith* [645 F2d 1179, 1185 (CA 2, 1981).] In *Solomon*, we concluded that the witness's certain in-court identification of the petitioner should have been excluded because her initially tentative identification was followed by, inter alia, repeated showings of the selected photograph in isolation, a courtroom showup, a lineup in which the witness identified someone else as the culprit, and eventually a highly suggestive lineup from which the witness selected the petitioner. We reached the same conclusion in *Dickerson v Fogg*, 692 F2d 238, 241-[2]42, 244-[2]45 (CA 2, 1982), where the initially tentative identification was transformed into a positive one by the combined effect of the police officer's conducting a showup, pressuring the witness into taking a second and third look at the suspect after his initial tentativeness, and then arresting the suspect in the witness's presence. [Emphasis added.]

Here, the victim tentatively selected the defendant from the lineup as her assailant, but her identification was something less than one hundred percent positive. Defendant correctly argues that the victim claimed to become positive of her identification only after she was exposed to the second suggestive identification procedure. Moreover, defendant contends that the victim's subsequent testimony about the first identification procedure was tainted by the second suggestive procedure. Thus, it is possible that the victim's "newfound certainty" about her identification resulted from the impermissibly suggestive law enforcement procedures.[6]

We also note that Officer Revord testified at the suppression hearing that he had not intended to show the photograph to the victim in order to identify the defendant. Rather, he stated that he went over to the victim's house to let her know they had arrested the suspected assailant, so that the victim "could begin to rest a little easier." When Officer Revord was at her house, he showed the victim a picture of the defendant he happened to have in his pocket because it "[j]ust kind of went with the name, you know."

While Officer Revord's intentions may not have been malicious, his subjective intent does not elimi-

---

[6] Indeed, this is the exact reason the Court must analyze whether the victim had an independent basis to identify her assailant in court. See part III. While a prior tentative identification may play an important role in establishing that the victim had an independent basis to later identify the defendant in Court, it does not eliminate the potential influence that a second, suggestive procedure may have on a subsequent in-court identification. In other words, the existence of a prior identification at a corporal lineup in this case does not mean that a subsequent in-court identification is admissible per se. The Court must still determine, under the totality of the circumstances, whether the witness has an independent basis to identify the defendant.

nate the possibility of a substantial likelihood of mis-identification. "[O]nly the effects of, rather than the causes for, pre-identification encounters should be determinative of whether the confrontations were unduly suggestive." *Thigpen v Cory*, 804 F2d 893, 895 (CA 6, 1986).[7] Therefore, even if Officer Revord truly only meant to placate the victim's fears by showing her a photograph of the defendant, his actions none-theless amounted to a highly suggestive identification procedure.[8]

III

Our inquiry does not end once we have found an invalid identification procedure. The second step in our analysis is to determine whether the victim had

---

[7] This does not mean that the government's intent is always irrelevant in determining whether a substantial risk of misidentification exists. In *United States v Emanuele*, 51 F3d 1123, 1129 (CA 3, 1995), the court explained:

[T]he government's intent may be one factor in determining the risk of misidentification, but it is not an essential element of defendant's burden of proof. A series of events that is suggestive and creates a substantial risk of misidentification is no less a due process violation, even absent evil intent on the part of the govern-ment. Stated differently, governmental intent is one of many factors in the totality of circumstances, but we expressly do not require defendant to establish the government's state of mind. On the other hand, evidence that the government intended and arranged such an encounter would be a substantial factor in the court's analysis.

[8] Defendant also challenges the admission of the victim's in-court iden-tification on the basis of his right to counsel during a photographic identi-fication procedure. *Kurylczyk*, 443 Mich 298. However, because we find that the identification procedure employed in this case was suggestive, it is unnecessary for us to further decide whether defendant was denied his right to counsel in this instance. The remedy for a violation of the right to counsel is the same as the remedy for an unduly suggestive identification procedure: suppression of the in-court identification unless there is an independent basis for its admission. *Anderson*, 389 Mich 169.

an independent basis to identify the defendant in court.[9] As we explained in *Anderson*, 389 Mich 169:

> If there was no counsel at the pretrial identification or if the procedures were unnecessarily suggestive or conducive to irreparable misidentification, then before an *in-court* identification may be received in evidence, the trial court must hold an evidentiary hearing out of the presence of the jury at which the people must show by clear and convincing evidence that the in-court identification has a basis independent of the prior identification procedure. [Emphasis in original.]

The independent basis inquiry is a factual one, and the validity of a victim's in-court identification must be viewed in light of the "totality of the circumstances." *Neil v Biggers*, 409 US 188, 199; 93 S Ct 375; 34 L Ed 2d 401 (1972). We review the trial court's findings for clear error. *Kurylczyk*, 443 Mich 303.

In *People v Kachar*, 400 Mich 78; 252 NW2d 807 (1977), this Court listed the following eight factors[10] that a court should use in determining if an independent basis exists:

---

[9] We note that the independent basis analysis does not apply to testimony about the suggestive identification procedure itself. "Direct testimonial evidence relating to the [suggestive] pre-trial out-of-court identification is per se excluded . . . ." *Anderson*, 389 Mich 169, citing *Gilbert v California*, 388 US 263, 273; 87 S Ct 1951; 18 L Ed 2d 1178 (1967).

[10] The federal courts look to the five factors outlined in *Biggers*:

> [T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. [409 US 199-200.]

We find these factors substantially similar to those listed in *Kachar*.

1. Prior relationship with or knowledge of the defendant.

2. The opportunity to observe the offense. This includes such factors as length of time of the observation, lighting, noise or other factor[s] affecting sensory perception and proximity to the alleged criminal act.

3. Length of time between the offense and the disputed identification. . . .

4. Accuracy or discrepancies in the pre-lineup or showup description and defendant's actual description.

5. Any previous proper identification or failure to identify the defendant.

6. Any identification prior to lineup or showup of another person as defendant.

7. . . . [T]he nature of the alleged offense and the physical and psychological state of the victim. "In *critical situations* perception will become distorted and any *strong* emotion (as opposed to mildly emotional experiences) will affect not only what and how much we *perceive*, but also will affect our *memory* of what occurred." [*Anderson*,] 389 Mich 211. (Emphasis in original.)

Factors such as "*fatigue, nervous exhaustion, alcohol and drugs*," 389 Mich 213 (emphasis in original), and age and intelligence of the witness are obviously relevant. Levine and Tapp, *The Psychology of Criminal Identification: The Gap from* Wade *to* Kirby, 121 U Pa L R 1079, 1102-1103 (1973).

8. Any idiosyncratic or special features of defendant. [400 Mich 95-96.]

We find the eight factors listed in *Kachar* relevant to our determination whether the victim in this case had a sufficiently independent basis to identify the defendant in court.[11] We analyze this case under these

---

[11] Although we are not bound to follow *Kachar* because it was not signed by a majority of the justices participating, see *Kurylczyk*, 443 Mich 300, n 9, we adopt the use of the factors in this opinion. We note that the eight factors have been affirmatively cited in dicta by this Court in *People v Carter*, 415 Mich 558, 598-599; 330 NW2d 314 (1982), and also by Justice

eight factors, placing great emphasis on the second factor (the opportunity to observe the offense), and the fifth factor (any previous proper identification or failure to identify the defendant).[12]

### A. PRIOR RELATIONSHIP

In this case, there was no prior relationship with the defendant. The victim saw her assailant for the first time on the night of the assault. Therefore, this factor does not support finding an independent basis for identification.

### B. OPPORTUNITY TO OBSERVE

This factor plays a significant role in the independent basis analysis. "The witness's opportunity for observation during the crime is the factor most frequently considered in both independent source and reliability cases. Whether it is a supporting or negating factor depends on the facts of each case." Sobel, *Eyewitness Identification, supra* at § 6.3, p 6-8. Generally, courts have found that the longer the crime, the better the witness' opportunity to observe. *Id.* Moreover, courts have often "remarked that rape victims usually have a better opportunity to observe their assailants than victims or witnesses of other crimes." *Id.* at § 6.3(a), p 6-13. For example, in *Biggers*, the United States Supreme Court stated:

---

BOYLE's separate opinion in *People v Lee,* 434 Mich 59, 110-111, n 4; 450 NW2d 883 (1990) (BOYLE, J., dissenting in part and concurring in part).

[12] Because the independent basis inquiry is a factual one, not all eight factors will always be relevant to every case. Moreover, a court may put greater or lesser weight on any of the listed factors, depending on the circumstances of the case. Lastly, the eight factors listed above are not exhaustive. There may be certain facts in a given case that the court considers relevant to the inquiry, yet do not fit neatly in any one of the eight factors.

The victim spent a considerable period of time with her assailant, up to half an hour. She was with him under adequate artificial light in her house and under a full moon outdoors, and at least twice, once in the house and later in the woods, faced him directly and intimately. *She was no casual observer, but rather the victim of one of the most personally humiliating of all crimes.* [409 US 200 (emphasis added).]

Similarly, in the present case, the trial court properly found that the victim had adequate time and opportunity to observe her assailant. Defendant challenges this holding, arguing that the lighting during the time of the assault, as well as the position of the defendant in the back seat of the car, precluded the victim from getting a good look at her assailant. However, we find substantial support for the trial court's conclusion.

First, the entire assault lasted for approximately one hour. Second, during this time, the victim was forced into intimate contact with the defendant. The victim testified on at least two separate occasions that she was forced to kiss the assailant on the lips.[13]

---

[13] This is drawn from the victim's testimony at the preliminary examination:

Q. All right. And then what happened after that?
A. He wanted me to kiss him.
Q. Did you?
A. I was crying and I didn't want to and he started yelling then.

\*   \*   \*

Q. All right. So you did then kiss him at that point?
A. (nods)

\*   \*   \*

Q. And what happened in the back seat?
A. He had me—wanted me to kiss him again.

Additionally, when she was forced to have intercourse, she testified that the assailant's head was "[r]ight in front of my face."[14] Third, the victim testified that even though it was dark when the assault began, she was able to get a good look at the assailant's face because of the artificial light from Econo Foods, and because, by the time the assault was ending, it was already becoming daylight.[15] On the basis of these facts, we conclude the trial court did not err in concluding that the victim did have a substantial opportunity to observe the assailant.

---

*Q.* And did you?

*A.* Yes.

[14] The victim was responding to the following question:

*Q.* And when you had intercourse with the perpetrator, when you got on top of him, in which direction was his head?

*A.* Right in front of my face.

[15] At the motion to suppress victim's in-court identification, the victim was questioned extensively about the lighting during the assault. The following passage summarizes her testimony:

*Q.* And none of the other looks that you got of the attacker that night were as good as that one in the Econo Foods parking lot, correct?

*A.* Well, not necessarily because when he had me on I Street it was daylight out.

\*   \*   \*

*Q.* So you're saying that it was light out at this time, so you got a pretty good look at him then too?

*A.* When we were on I Street.

*Q.* Better than the look at Econo Foods?

*A.* About the same. It was light out in front where I was parked at Econo Foods.

### C. LENGTH OF TIME BETWEEN OFFENSE AND IDENTIFICATION

The assault occurred on April 6, 1993, and the identification occurred on May 2, 1993. This relatively short period between the assault and the identification ensures that the crime was still fresh in the victim's mind, and should not weigh against finding an independent basis.

### D. ACCURACY OF VICTIM'S DESCRIPTION WITH DEFENDANT'S ACTUAL DESCRIPTION

The victim's description of her assailant was not extremely detailed. She described her attacker as a stocky white male, about forty to fifty years old, six feet tall, who was unshaven and had a receding hairline that was thinning on top, and who had an odd looking lower lip. Defendant's actual description, as it appears in the affidavit for the search warrant is "[a] 43 year old white male, whose DOB is 6/16/49, who is approximately 5'8" and weighs approximately 180-190 lbs., has blonde hair, high forehead and thinning hair on top . . . ."

We agree with the trial court that the defendant generally fits the description given by the victim to the police. However, because the description is rather vague, we accord it little weight in our analysis.

### E. ANY PREVIOUS PROPER IDENTIFICATION

The victim saw defendant during a proper corporal lineup[16] before the suggestive photographic display at her home. During that lineup, the victim focused on the defendant, but stated that she could not be sure that he was the assailant. In particular, she thought

---

[16] The defendant does not argue that the original corporal lineup was impermissibly suggestive.

the defendant's eyes and face fit those of her assail-
ant, but that his bottom lip did not look like what she
remembered. The victim later testified at the motion
to suppress her in-court identification. There, she
explained that her failure to positively identify the
defendant was due to her erroneous belief that she
had to be "100 percent positive" before she identified
anybody.[17] She further testified that she had "zoned
in" on the defendant right away, and that she was "at
least 95 percent" certain that defendant was her
assailant.

While the failure to identify the defendant at a prior
corporal lineup may in some circumstances negate
the finding of an independent basis, we do not find
that to be the situation in this case. The victim
selected the defendant from the lineup, but was not
absolutely positive that he was the assailant. This is
not a situation in which "the defendant was among
those exhibited but not selected by the witness."
Sobel, § 6.7, p 6-32.1. Rather, the defendant was tenta-
tively identified at the lineup. See *United States v
Emanuele*, 51 F3d 1123, 1131 (CA 3, 1995) ("Upon
viewing her first photospread, Hottel recognized
defendant as the robber. Her slight qualification—not
being 'one hundred percent sure'—does not signifi-
cantly diminish the import of that identification").

Defendant argues that the victim's testimony about
her certainty at the first lineup is inherently tainted
by the improper photographic display. In other words,
the victim only became certain when she saw the

---

[17] The victim testified that she was told she had to be one hundred per-
cent positive by a person who was at the lineup, but that she could not
identify. The trial court was unable to verify who this unidentified man
was and exactly what he told the victim.

photograph, and that her memory of the lineup has also been improperly influenced by the photograph. However, even if we limit our review to the victim's statement that was made after the lineup, we still believe that the victim tentatively identified the defendant. In her written statement after the lineup, she stated:

> Number six looked like him, but I can't be sure. His eyes and face fit, but his lips were what threw me off. His eyes really look like the eyes I remember. I can't be positive, but there is something about his eyes and face.

Even though she could not be absolutely certain, she still selected defendant out of the lineup.

In this case, the extent to which the victim's testimony regarding the corporal lineup may have been influenced by the suggestive display of the photograph is an issue that speaks to the weight of the testimony rather than its admissibility. There is no question that the victim picked defendant out of the lineup; the only issue in dispute is how certain she was about the initial identification. Thus, the victim's testimony addresses the level of certainty of the identification, not the existence of the identification itself. While this may be fertile ground for cross-examination, it should not prevent the introduction of the in-court identification.[18]

---

[18] As explained in *United States v Causey*, 834 F2d 1277, 1285 (CA 6, 1987):

> "[A] defendant is denied due process only when the identification evidence is so unreliable that its introduction renders a trial unfair. As long as there is not a substantial likelihood of misidentification, it is the function of the jury to determine the ultimate weight to be given the identification." [Citations omitted.]

In short, we find the victim's identification at the corporal lineup a factor that weighs in favor of finding an independent basis for an in-court identification, even though it was less than one hundred percent certain.

### F. IDENTIFICATION OF ANOTHER PERSON

To a certain extent, this relates to the discussion of the previous factor. The victim had not identified any other person as the assailant; she only identified the defendant.

### G. THE PHYSICAL AND PSYCHOLOGICAL STATE OF THE VICTIM

We believe the trial court properly determined that "while [the victim] was very very nervous at the time of the contact between herself and the assailant, . . . she did not lose her senses and was in control of herself because she was thinking about her five children and her desire to see them again." There is no evidence in the record that indicates the victim's perceptions were distorted by her physical or psychological state to an extent that she would not be able to later identify her assailant.

### H. IDIOSYNCRATIC OR SPECIAL FEATURES OF THE DEFENDANT

As discussed above, the victim had stated that the defendant had "odd looking" lips. During her testimony at the motion to suppress her in-court identification, the victim testified that, on the night of the assault, the assailant's bottom lip "looked either big or swollen or something odd about it." Given this testimony, we believe the trial court properly concluded that there was "no testimony on any special feature of the Defendant that would assist in the identification or would hinder a proper identification of the Defend-

ant." The fact that defendant's lip did not look "big or swollen" during the corporal lineup is not sufficient to prevent a finding of an independent basis for the in-court identification, given that it is possible defendant's lip was no longer swollen by the time of the lineup.

IV

Our analysis of the facts in this case lead us to conclude that, although Officer Revord's actions amounted to an impermissibly suggestive identification procedure, the victim in this case had a sufficiently independent basis for her in-court identification of the defendant. In particular, as the "victim of one of the most personally humiliating of all crimes," *Biggers*, 409 US 200, she had more than sufficient opportunity to observe her assailant. Moreover, the victim tentatively identified defendant as her assailant in a corporal lineup before she was shown the suggestive photograph by Officer Revord. While the victim could not be one hundred percent positive at the lineup, she was sufficiently certain to be able to pick out the defendant. In this instance, any evidence of the victim's lack of certainty would be relevant to the weight that the evidence should be given, but not to its admissibility.

In sum, we hold that the trial court did not err in denying defendant's motion to suppress the victim's in-court identification.

We affirm the decision of the Court of Appeals.

MALLETT, C.J., and BRICKLEY, BOYLE, WEAVER, KELLY, and TAYLOR, JJ., concurred with CAVANAGH, J.