*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

OMARION DEWANDE HOLLIS,

Defendant-Appellant.

UNPUBLISHED
May 27, 2025
10:16 AM

No. 373136
Wayne Circuit Court
LC No. 24-003478-01-FC

Before: M. J. KELLY, P.J., and SWARTZLE and ACKERMAN, JJ.

PER CURIAM.

In this interlocutory appeal, defendant challenges two circuit court orders: one denying his motion to suppress identification evidence and the other denying his motion to suppress evidence obtained through search warrants for certain cell phone records. Because the photographic identification procedure employed by law enforcement was unduly suggestive, tainting both the pretrial and in-court identifications, and because the search warrants lacked the particularity required by the Fourth Amendment, we reverse the circuit court's orders and remand for further proceedings.

## I. FACTUAL BACKGROUND

This case arises out of the nonfatal shooting of complainant in Detroit during the early morning hours of April 30, 2024. Complainant was walking through a residential neighborhood when the perpetrator approached and shot him on the right side of his chest beneath his collarbone, then fled before law enforcement arrived. At the scene, complainant told first responders that he did not see the shooter's face because the shooter was wearing a mask. He believed, however, that the shooter was a black male. Approximately one-and-a-half hours later, during an interview at the hospital, complainant provided a more detailed—but still limited—description. He described the perpetrator as a "black male, 5'8" in height, and weighing 140 [pounds]," wearing a "full black ski mask with dreads sticking out from under" the mask. Police identified defendant as a suspect

-1-

based on prior police contacts in the area and his general consistency with the complainant's description of a black male of average height with dreadlocks.

Four days later, Detectives Clinton Mack and Marc Thompson visited complainant in his hospital room to administer a photographic lineup. Prior to showing the array, Detective Mack told complainant that the photographs were "random." He later added that "[t]here'll be one person who we think did it, and then randoms." The array consisted of photographs of six black men with dreadlocks, though only one—defendant—had dreadlocks long enough to extend from underneath a ski mask as described by complainant. Complainant examined the photographs and initially expressed uncertainty regarding defendant's photograph, stating, "I don't know. It's like 50/50. Is he the dude or not?" He noted that it had been dark outside and that the shooter was masked, so he "didn't see a lot." He continued to look through the array before returning to defendant's photograph. Detective Mack then took defendant's photograph from complainant's hand and asked, "The question is: do you recognize the person in this picture? You say he may be the person, you're 50/50 percent [sic] sure?" Complainant nodded. The detective asked, "What did this person do?" Complainant responded, "Pulled a gun out and shot me." He then signed defendant's photograph as requested by Detective Mack.

Within a week of the identification, Detective Thompson submitted three electronic applications for search warrants pertaining to different T-Mobile cell phone lines allegedly associated with defendant. The applications sought a broad array of telecommunication records over a three-day period encompassing the date of the shooting. In support of the applications, Detective Thompson stated that complainant "made a positive identification" of defendant as the shooter. The circuit court authorized the search warrants. The search warrant return for one of the phone lines included a Call Report and Tower Map indicating that the associated phone was in the general vicinity of the shooting when it occurred.[1]

Defendant was thereafter charged with assault with intent to commit murder (AWIM), MCL 750.83, assault with intent to commit great bodily harm less than murder (AWIGBH), MCL 750.84(1)(a), assault with a dangerous weapon (felonious assault), MCL 750.82(1), and three counts of carrying a firearm during the commission of a felony (felony-firearm), MCL 750.227b.

## II. PROCEDURAL HISTORY

At the preliminary examination, complainant's testimony diverged in several respects from his earlier statements to law enforcement. Whereas he initially told officers that he could not see the shooter's face because it was covered by a ski mask and it was dark outside, he testified at the preliminary examination that the shooter was "probably" wearing a COVID-style mask that covered the shooter's face "a little bit" and allowed him to see the shooter's forehead, eyes, mouth, and hair. He also testified—for the first time—that he had previously seen the shooter on Detroit's

---

[1] The other two search warrants did not return any relevant information and are not at issue in this appeal.

east side, although he could not recall when or under what circumstances. He identified defendant as the shooter, and the district court bound defendant over to the circuit court as charged.

Defendant subsequently moved to suppress both complainant's pretrial and in-court identifications, contending that the photographic lineup procedure was impermissibly suggestive. He also moved to suppress the evidence obtained from the search warrant, averring that the supporting application falsely stated that complainant had made a positive identification and that the warrant lacked sufficient particularity. After reviewing body-camera footage of complainant's initial statements at the scene and the photographic lineup, the circuit court denied both motions. As to the identification evidence, the court found that the lineup was not unduly suggestive and that there was an independent basis for complainant's in-court identification, citing his testimony that he had seen the shooter previously on the east side of Detroit. As to the cell phone records, the court found that the warrant application did not contain any false statements and that the warrants were sufficiently particularized. Defendant now appeals.

## III. DISCUSSION

### A. STANDARD OF REVIEW

"We review de novo a trial court's ultimate decision on a motion to suppress on the basis of an alleged constitutional violation." *People v Gingrich*, 307 Mich App 656, 862 NW2d 432 (2014). We review for clear error the trial court's findings of fact from a suppression hearing. *Id*. "A finding of fact is clearly erroneous if, after a review of the entire record, an appellate court is left with a definite and firm conviction that a mistake has been made." *Id*. (citation omitted). The trial court's application of the law to the facts underlying a suppression motion is a constitutional issue that we review de novo. *People v Sammons*, 505 Mich 31, 41; 949 NW2d 36 (2020).

### B. IDENTIFICATION EVIDENCE

### 1. PRETRIAL IDENTIFICATION

Defendant submits that complainant's pretrial identification should be suppressed because it resulted from an unduly suggestive photographic lineup. We agree.

"Due process protects criminal defendants against the introduction of evidence of, or tainted by, unreliable pretrial identifications obtained through unnecessarily suggestive procedures." *Id*. (cleaned up). A defendant challenging identification evidence on due-process grounds "must show that the pretrial identification procedure was so suggestive in light of the totality of the circumstances that it led to a substantial likelihood of misidentification." *People v Kurylczyk*, 443 Mich 289, 302; 505 NW2d 528 (1993). Identification evidence must be excluded when "(1) the identification procedure was suggestive, (2) the suggestive nature of the procedure was unnecessary, and (3) the identification was unreliable." *Sammons*, 505 Mich at 41.

"Improper suggestion often arises when the witness when called by the police or prosecution either is told or believes that the police have apprehended the right person" or "when the witness is shown only one person or a group in which one person is singled out in some way . . . ." *People v Gray*, 457 Mich 107, 111; 577 NW2d 92 (1998) (cleaned up). Our Supreme Court has further held:

Generally, the photo spread is not suggestive as long as it contains some photographs that are fairly representative of the defendant's physical features and thus sufficient to reasonably test the identification. Thus, differences in the composition of photographs, in the physical characteristics of the individuals photographed, or in the clothing worn by a defendant and the others pictured in a photographic lineup have been found not to render a lineup impermissibly suggestive.

However, a court will find that a witness' identification of a defendant was the product of an improper photographic identification if differences in the photographs led to a substantial likelihood of misidentification. In such cases, witnesses typically select a defendant on the basis of some external characteristic, rather than on the basis of the defendant's looks. [*Kurylczyk*, 443 Mich at 304-305 (quotation marks and citations omitted).]

"The relevant inquiry, therefore, is not whether the lineup photograph was suggestive, but whether it was unduly suggestive in light of all of the circumstances surrounding the identification." *Id*. at 306.

When examining the likelihood of misidentification under the totality of the circumstances, courts assess factors that include "(1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of his prior description of the criminal, (4) the level of certainty demonstrated at the confrontation, and (5) the time between the crime and the confrontation." *Sammons*, 505 Mich at 50-51 (quotation marks and citation omitted). "A primary aim of excluding identification evidence obtained under unnecessarily suggestive circumstances . . . is to deter law enforcement use of improper lineups, showups, and photo arrays in the first place." *Perry v New Hampshire*, 565 US 228, 241; 132 S Ct 716; 181 L Ed 2d 694 (2012).

Here, complainant told police at the scene that he did not see the shooter's face because the shooter was wearing a mask. At the hospital, he reiterated that he could not see the shooter's face but noted that the shooter had dreadlocks extending from under a ski mask. Days later, complainant was shown a photographic array of six black men. Only one photograph—defendant's—depicted someone with dreadlocks of sufficient length to match complainant's limited description.[2] He appeared to eliminate the other lineup photographs after determining that those subjects' dreadlocks would not be visible under a ski mask.

---

[2] Federal courts have found lineups unduly suggestive under similar circumstances. See, e.g., *United States v Perez*, 248 F Supp 2d 111, 113 (D Conn, 2003) (holding that the lineup was unduly suggestive where defendant's "dark-skinned photograph juxtaposed with all other markedly lighter faces resulted in an identification procedure which was unduly suggestive to [defendant]"); *United States v Eltayib*, 88 F3d 157, 166-167 (CA 2, 1996) (holding that the photographic array was unduly suggestive where the witness had described perpetrator as having "a head full of hair, real bushy hair, afro-type hair," the defendant's photograph was the only one showing a full head of hair, and the other lineup participants had darker skin than the defendant).

Throughout the procedure, complainant repeatedly expressed uncertainty. He stated he was "50/50" about whether the person pictured in defendant's photograph was the shooter, citing the dark conditions, the masked face, and the brevity of the encounter. The record shows that the only distinguishing characteristic complainant consistently recalled—the length of the shooter's dreadlocks—appeared in just one of the photographs.

Considering the totality of the circumstances—including complainant's limited ability to see the shooter, the generic nature of the characteristic on which the identification was based, the lack of comparable photographs in the array, and complainant's repeated expressions of doubt— we conclude that the lineup procedure was unduly suggestive and gave rise to a substantial likelihood of misidentification. See, e.g., *People v Thomas*, 501 Mich 913 (2017)[3] (finding a pretrial identification unreliable where the victim had limited ability to see the assailant's face, offered a generic description, and changed that description over time). The trial court therefore erred in denying defendant's motion to suppress the pretrial identification.

## 2. IN-COURT IDENTIFICATION

Defendant also contends that the circuit court erred by denying his motion to suppress complainant's in-court identification testimony because the impermissibly suggestive lineup tainted it and there is no independent basis for the in-court identification.

Even when a pretrial identification is obtained through unduly suggestive procedures, a witness may still be permitted to provide in-court identification testimony "if there is an independent basis for establishing the reliability of the identification." *People v Posey*, 512 Mich 317, 332; 1 NW2d 101 (2023); see also *Kurylczyk*, 443 Mich at 303. In determining whether an independent basis exists, courts consider the following eight factors:

1. Prior relationship with or knowledge of the defendant.

2. The opportunity to observe the offense. This includes such factors as length of time of the observation, lighting, noise or other factors affecting sensory perception and proximity to the alleged criminal act.

3. Length of time between the offense and the disputed identification.

4. Accuracy or discrepancies in the pre-lineup or show-up description and defendant's actual description.

5. Any previous proper identification or failure to identify the defendant.

6. Any identification prior to lineup or showup of another person as defendant.

---

[3] "Supreme Court orders that include a decision with an understandable rationale establish binding precedent." *People v Giovannini*, 271 Mich App 409, 414; 722 NW2d 237 (2006).

7. The nature of the alleged offense and the physical and psychological state of the victim. In critical situations perception will become distorted and any strong emotion (as opposed to mildly emotional experiences) will affect not only what and how much we perceive, but also will affect our memory of what occurred.

Factors such as fatigue, nervous exhaustion, alcohol and drugs, and age and intelligence of the witness are obviously relevant.

8. Any idiosyncratic or special features of defendant. [*Posey*, 512 Mich at 322-323 (cleaned up).]

"The independent basis inquiry is a factual one, and the validity of a victim's in-court identification must be viewed in light of the totality of the circumstances." *Gray*, 457 Mich at 115 (quotation marks and citation omitted).

With respect to his prior relationship with or knowledge of defendant, complainant repeatedly told law enforcement that he did not know who shot him and made no claim during those initial interactions that he recognized the shooter. At the preliminary examination, however, he claimed for the first time that he had previously seen the shooter—defendant—on the east side of Detroit. Cf. *Gray*, 457 Mich at 112 ("[T]his case . . . presents the danger that once the identity of the victim's assailant was suggested to her through the photographic identification procedure, she may be likely to base later identifications of the suspect upon that photograph, rather than on her recollection of the crime." (cleaned up)). Despite asserting that he had previously seen the shooter, complainant could not recall when or under what circumstances. This vague and belated assertion, lacking any meaningful detail, does not support a finding that complainant had prior knowledge of defendant.

Complainant's opportunity to observe the shooter was also limited. He acknowledged that it was dark outside when the shooting occurred but claimed that the area was illuminated by a streetlight. He estimated that the shooter was five to ten feet away and that he saw the shooter for five to ten seconds. He described the shooter as wearing "a mask probably" or a "COVID mask" over his mouth and that he could see the shooter's eyes, forehead, hair, and skin color. That testimony differed markedly from his earlier statements to law enforcement, during which he maintained that he did not see the shooter's face. During those initial interactions, complainant could provide only a generic description of the shooter and repeatedly expressed uncertainty about his ability to identify the shooter, citing the dark conditions, the "full black ski mask" worn by the shooter, and his disorientation after the shooting. Complainant's initial statements to police, made far closer in time to the shooting, undermine the credibility of his subsequent preliminary examination testimony. Considering that complainant's opportunity to observe the offense was significantly limited by the short duration of the shooting, dark conditions, and mask obstructing the shooter's face, this factor weighs against finding an independent basis. See *United States v Wade*, 388 US 218, 228; 87 S Ct 1926; 18 L Ed 2d 1149 (1967) ("[T]he dangers for the suspect are particularly grave when the witness' opportunity for observation was insubstantial, and thus his susceptibility to suggestion the greatest."); see also *Gray*, 457 Mich at 117 ("Generally, courts have found that the longer the crime, the better the witness' opportunity to observe.").

The time between the offense on April 30, 2024, and the in-court identification on June 18, 2024, was of moderate length and does not weigh strongly for or against an independent basis.

Complainant's physical description of the shooter was vague but broadly consistent with defendant's appearance. He described the shooter as a "black male, 5'8" in height, and weighing 140 [pounds]," with long dreadlocks. While that description was not detailed, it was also not inaccurate. We therefore accord this factor only limited weight.

Similarly, we give little weight to complainant's pretrial identification of defendant. As discussed above, the identification resulted from an unduly suggestive procedure, and complainant was uncertain about the identification at the time. This weighs against a finding of an independent basis.

The nature of the shooting and complainant's physical and psychological state weigh against reliability. Complainant reported that he was walking alone in a residential neighborhood when a masked shooter approached him and shot him without provocation, causing him to fall to the ground. He saw the shooter for five to ten seconds but could not see the shooter's face due to the ski mask. He fell to the ground and covered his face after being shot, could not recall the face of the bystander who helped him, and did not initially realize he had been shot. Those circumstances suggest that complainant's "perceptions were distorted by [his] physical or psychological state to an extent that [he] would not be able to later identify [his] assailant." *Id*. at 123.

Finally, in light of complainant's generic description of the shooter as a black male of average height and weight with long dreadlocks, the factor concerning idiosyncratic or special features of defendant weighs against a finding of an independent basis.

Taken together, the factors outlined in *Posey* do not support a finding that complainant had an independent basis for identifying defendant in court. It appears highly probable, as defendant purports, that complainant "filled the gaps in his memory based on a tainted and unduly suggestive photo array," and the subsequent in-court identification was vitiated by the impermissibly suggestive lineup procedure. See *Wade*, 388 US at 229 ("It is a matter of common experience that, once a witness has picked out the accused at the line-up, he is not likely to go back on his word later on, so that in practice the issue of identity may . . . for all practical purposes be determined there and then, before the trial." (cleaned up)). Given the suggestiveness of the pretrial procedure and the absence of meaningful indicia of reliability, the circuit court erred by denying defendant's motion to suppress the in-court identification.

## C. SEARCH WARRANT

Defendant next claims that the circuit court erred by denying his motion to suppress cell phone evidence seized pursuant to a search warrant because the search warrant was invalid. We agree: the warrants lacked the particularity required by the Fourth Amendment and were not supported by a sufficient nexus between the evidence sought and the alleged offense.

"Both the United States and Michigan Constitutions guarantee the right against unreasonable searches and seizures." *People v Armstrong*, 344 Mich App 286, 295; 1 NW3d 299 (2022). "[T]he general rule is that officers must obtain a warrant for a search to be reasonable

under the Fourth Amendment," and that requirement applies to searches of cell phone data. *People v Carson*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 355925); slip op at 11. "The Fourth Amendment only allows search warrants 'particularly describing the place to be searched, and the persons or things to be seized.' " *Id*., quoting US Const, Am IV. "It is well settled that a search may not stand on a general warrant." *People v Brcic*, 342 Mich App 271, 278; 994 NW2d 812 (2022) (quotation marks and citation omitted).

"The purpose of the particularity requirement in the description of items to be seized is to provide reasonable guidance to the executing officers and to prevent their exercise of undirected discretion in determining what is subject to seizure." *Carson*, ___ Mich App at ___; slip op at 11 (citation omitted). This requirement is particularly important in the context of cell phone data in light of "the sheer amount of information contained in cellular data and the highly personal character of much of that information." *People v Hughes*, 506 Mich 512, 542; 958 NW2d 98 (2020).

To be sufficiently particular, a search warrant "must state with particularity not only the items to be searched and seized, but also the alleged criminal activity justifying the warrant." *Id*. at 528. "[S]ome context must be supplied by the affidavit and warrant that connects the particularized descriptions of the venue to be searched and the objects to be seized with the criminal behavior that is suspected, for even particularized descriptions will not always speak for themselves in evidencing criminality." *Id*.

In *Carson*, ___ Mich App at ___; slip op at 13, this Court held invalid a search warrant that essentially "authorized the modern equivalent of the police combing through a person's entire home in search of any evidence that might somehow implicate the person in the crime for which they were a suspect." In that case, the warrant sought "[a]ny and all data including . . . text/picture messages, pictures and videos, address book, any data on the SIM card if applicable, and all records or documents which were created, modified, or stored" on the device. *Id*.. In holding the warrant invalid, the *Carson* Court reasoned that "[w]e are living in a time during which it can be reasonably assumed that any given person essentially has their entire life accessible from their phones," and search warrants therefore "must be carefully limited in scope." *Id*. at ___; slip op at 13.

Here, the search warrant at issue sought a broad range of telecommunications data for a phone number allegedly associated with defendant. The warrant sought, among other things, the following data for the period of April 29, 2024 through May 1, 2024:

1. All incoming/outgoing calls, with numbers dialed and call duration[.]

2. Cellular tower / cell site utilization information without geographical limitations to include applicable location identifier data and relevant maps showing all cell-site and cell tower locations, sectors, and orientations in the specified market[.]

3. Text Messaging data/Incoming and Outgoing messages, with content . . . [.]

* * *

11. Any and all data available from any "Cloud" storage systems linked to the account of the target number(s).

12. Access to the voicemail systems of the target number(s) in order to retrieve the data/messages maintained on the voicemail server for the target number(s).

13. Internet protocol data records including cell site location information and Packet Data.

In support of the warrant application, Detective Thompson asserted that complainant "made a positive identification of [defendant] as the person who shot him." He further stated:

Affiant knows that people often communicate with each other using electronic devices, such as cell phones. Affiant has reason to believe, based on knowledge, experience and training that the data from the call detail records[] will assist in providing Law Enforcement with the location of [defendant] at the time of the shooting based on the tower locations provided with the call detail records. This will assist the Affiant with this ongoing non-fatal shooting investigation of [complainant].

\* \* \*

Affiant believes such information is relevant and material to the ongoing criminal investigation in obtaining and preserving historical cell phone call detail, and specialized location records could also prove to be fruitful, as such records could assist investigators not only with identifying those who may have been in contact with the victim(s) or potential co-conspirators, but may also allow investigators other opportunities, including, but not limited to, confirmation or the disproving of alibis, statements, and other observations.

\* \* \*

Affiant has probable cause to believe . . . that information obtained from the call detail records, cell site activity, cell site locations and historical billing records, [SMS] and [MMS] messaging, for the target number(s) . . . will provide evidence aiding in discovery or [sic] persons responsible [for] the aforementioned criminal investigation and/or provide evidence to aid in said person[']s prosecution.

The warrant lacked sufficient particularity to satisfy the requirements of the Fourth Amendment. It authorized the collection of virtually all telecommunications data associated with the phone number over a multi-day period, without geographic restriction and without limiting the categories of data to those tied to the offense under investigation. In addition to call and location data, the warrant sought access to cloud storage accounts—effectively authorizing a search of the entire contents of those accounts as they existed during the covered time frame. But unlike live communications, cloud storage may include years of accumulated personal data: messages, photos, documents, browsing history, location records, and other digital materials reflecting a person's life, thoughts, and associations. Searching such content on the mere basis that it existed during a specified three-day period is not a narrow inquiry—it is, as in *Carson*, the modern equivalent of rummaging through every drawer and hard drive in a suspect's home without regard to what is being sought or why.

Moreover, neither the search warrant nor the application "connect[ed] the particularized descriptions of the venue to be searched and the objects to be seized with the criminal behavior that is suspected." *Hughes*, 506 Mich at 538. Although the application generally asserted that cell phone records are useful in investigations and that the records sought would aid in identifying and prosecuting the shooter, it did not allege that the shooter possessed or used a cell phone before, during, or after the shooting. Stated differently, the search warrant and application failed to establish a nexus between the records sought and the offense alleged. In the absence of such a nexus, the search was not "reasonably directed at finding evidence of the criminal activity identified within the warrant" and was therefore not sufficiently particularized. *Id*. at 542-543.[4]

The prosecution contends that even if the search warrant was invalid, the evidence seized pursuant to it should still be admitted under the good-faith exception. See *People v Hellstrom*, 264 Mich App 187, 193; 690 NW2d 293 (2004) ("The 'good-faith' exception renders evidence seized pursuant to an invalid search warrant admissible as substantive evidence in criminal proceedings where the police acted in reasonable reliance on a presumptively valid search warrant that was later declared invalid."). However, as in *Carson*, "the warrant in this specific case was so facially deficient by virtue of its failure to particularize the places to be searched and the things to be seized that the executing officers could not have reasonably presumed it to be valid." *Id*. at ___; slip op at 15. The good-faith exception is therefore inapplicable. Because the search warrant was constitutionally invalid and no exception applies, the circuit court erred by denying defendant's motion to suppress the resulting cell phone evidence.

IV. CONCLUSION

We reverse the orders denying defendant's motion to suppress evidence of complainant's pretrial and in-court identifications and motion to suppress the cell phone evidence, and we remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Michael J. Kelly
/s/ Brock A. Swartzle
/s/ Matthew S. Ackerman

---

[4] The prosecution contends that any lack of particularity in the warrant was cured by the "incorporated" application. See *Brcic*, 342 Mich App at 279 (holding that "a facially invalid search warrant *may* be saved by incorporated documents"). But even assuming the warrant properly incorporated the application by reference, the application similarly lacked sufficient particularity. The prosecution's reliance on the application is therefore misplaced.