COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

ROBERT EARL COWAN,

       Defendant-Appellee.

UNPUBLISHED
October 20, 2015

No. 321937
St. Clair Circuit Court
LC No. 13-003248-FC

Before: BORRELLO, P.J., and JANSEN and OWENS, JJ.

PER CURIAM.

A jury convicted defendant of armed robbery, MCL 750.529, and possession of a firearm during the commission of a felony (felony firearm), MCL 750.227b. The jury acquitted defendant of first-degree home invasion, MCL 750.110a(2), and conspiracy to commit both armed robbery and home invasion, MCL 750.157a. The court sentenced defendant as a second habitual offender, MCL 769.10, to a prison term of 15 to 40 years' for the robbery conviction, and a consecutive two-year sentence for the felony-firearm conviction. For the reasons set forth in this opinion, we affirm defendant's convictions, and remand to the trial court for a determination of whether resentencing is warranted under *People v Lockridge*, ___Mich___; ___NW2d___(2015) (Docket No. 149073) and *United States v Crosby*, 397 F3d 103, 117-118 (CA 2, 2005).

## I. BACKGROUND

Defendant's convictions arise from a November 15, 2013, armed robbery inside a home in Port Huron where the following victims were present: David Scott, Matthew Miles, Kristopher McConnell, Susan Jackson, and Samantha Milligan. Jackson is the mother of Scott and McConnell, and Milligan was McConnell's fiancée. Miles was a friend who was visiting.

Jackson, Scott, McConnell, Miles, and Milligan all testified that they were at 923 Bancroft Street on the evening of November 15, 2013. McConnell testified that between 5:30 and 5:45 p.m., he walked down to the corner store to buy some drinks and then returned home when an armed man suddenly entered the house and stepped into the front room. Scott described the man as black, tall, and stocky, and said he was wearing a coat with a fur-trimmed hood. He identified defendant as the robber. McConnell described the man as a "larger black male" and said he was wearing a dark-colored coat with a fur-trimmed hood and an orange cap or beanie. He identified defendant as the robber. Miles described the man as a "big black guy" but "didn't

see his face," remarking that "[i]t was more like he had a mask on." Miles could not identify defendant as the robber. Milligan described the perpetrator as "big" and said he was wearing a dark-colored hoodie that was "heavy like a coat," with a fur-trimmed hood, a yellow or orange "winter beanie," jeans, and black and red or black and green shoes. Miles identified defendant as the perpetrator. Jackson testified that the perpetrator was black and wearing a green coat with "fuzz" around the hood. Jackson could not identify defendant as the perpetrator.

Scott testified that defendant "asked for a guy named Duper." Scott denied knowing who he was talking about, and defendant asked him if he "thought it was a game or if the gun was fake." Defendant began to pace and said that he knew Duper was in the house and "kept asking where he was." Scott testified that defendant then ordered everyone to stand against the wall by the bathroom. Scott, McConnell, and Milligan did as they were told, but Miles remained where he was, "trying to convince [defendant] that he knew where Duper was." The ploy did not work, and defendant "pistol whipped" Miles by striking him on top of the head with the gun and forced him "against the wall with the rest of us." Defendant then "went through everybody's pockets and wanted everybody's phone and wallet or anything like that." While defendant was checking McConnell for valuables, Scott removed his phone from his pocket, hoping to hide it. Defendant saw this, went over and took the phone, hit Scott, and threw him to the floor. Defendant told him to lie face down. Photographs of Scott taken that night were admitted into evidence. They did not show any signs of injury.

Scott testified that once he was on the floor, "another skinny black gentleman came to the back sliding door." The man had covered his face with his shirt. The man started going through the house "looking for stuff." Scott could not see what the man was doing, but he could "hear him moving around. Moving stuff around." Defendant addressed the man when he entered, but remained where he was, "making sure that we all stayed where we were supposed to be." Scott explained that he was able to turn his head and sneak glances now and then. Eventually the two men left by the back door. Scott said that once he realized the men had left, he and McConnell ran after the perpetrators. Scott ran down to the corner of Bancroft and 10th Streets, but did not see anyone. He returned home to wait for the police.

McConnell, Miles and Milligan offered testimony similar to Scott's. Jackson testified that she remained in the bathroom during the robbery, departing briefly upon the robber's permission to obtain her oxygen tank. Jackson testified that she did not see what was going on, but she heard people running up and down the stairs in the house.

Port Huron Police Officer Brandon Rossow was dispatched to the Bancroft Street house around 7:10 p.m. As he was driving up, Milligan flagged him down and reported "that they had just been robbed" by three African-American men. Milligan said that the intruders had been looking for someone who used to live there and that person might be living on Tunnel Street. Officer Rossow headed that way and found witnesses who reported seeing "three possible suspects that may have matched that description" heading south on 8th Street. The police set up a perimeter and a canine unit was called in.

McConnell testified that he stopped at the corner store to inquire about surveillance cameras. The clerk told him "that he did have a couple of cameras; that to send a detective over, an officer over to look at it." The clerk from the store testified to downloading the video footage

onto a flash drive and officers testified to collecting the flash drive and downloading the files onto a departmental computer. A camera covering the parking lot showed a gray SUV similar to a Mercury Mountaineer or a Ford Explorer pull into the parking lot a short time before the robbery. Three or four people got out of the vehicle. A camera inside the store showed McConnell making a purchase. The next person in line turned in a lottery ticket. That person was wearing "a puffier, bigger coat with fur around the hood and a hoodie." He also had on a yellow cap and a brightly-colored garment underneath the darker-colored coat. The clerk recognized that person as a regular customer and identified him as defendant. The video footage was admitted into evidence and played for the jury.

The police attempted to conduct a corporeal lineup, but defendant refused to participate and persuaded other inmates who had been selected not to participate either. The other inmates agreed to participate after being offered an extra meal, but defendant still refused. The victims were called in for a photographic lineup instead. Scott, McConnell, and Milligan were each shown arrays in which defendant's photograph was in a different position. Attorneys for the prosecution and the defense approved the photographs used in the arrays.

Scott testified that the gunman's hood was up, but he was not wearing a mask and Scott was able to see his face. Scott initially identified a man named Jamal as the gunman. After reviewing the array more carefully, he changed his mind and identified defendant. He rated the accuracy of his identification as "an 8 or a 9" on a scale of 1 to 10.

McConnell testified that the gunman's hood was up, but he was not wearing a mask and McConnell was able to see his face. McConnell saw two "very similar" people who might be the gunman. He was not able to identify defendant because the picture showed him "sucking in his bottom lip" and McConnell could not be sure he was the one. Upon seeing defendant at the preliminary examination, McConnell recognized him as the gunman. He was able to identify him by his prominent jaw and distinctive nose.

Milligan testified that the gunman's hood was up, but he was not wearing a mask and she was able to see his face. She also identified a man named Jamal as the gunman and said she was 85-percent sure her identification was correct. Upon seeing defendant at the preliminary examination, Milligan got "a feeling . . . in the pit of [her] stomach" and "just knew" he was the gunman. She was 100 percent sure of her identification of defendant.

Jackson testified that the gunman was not wearing a mask, but she got such a brief glimpse of him that she could not identify him and thus did not attend the lineup.

Miles testified that the gunman and his companions were all wearing masks that covered their faces below the eyes. He did not attend the lineup because his car broke down that day; he did not testify at the preliminary examination.

McConnell testified that the night before the preliminary examination, two women came to the house "asking me what they could give me to not show up in court." He said, "[t]hey offered me anything I wanted not to come to court." Specifically, "[t]hey offered me my PlayStation 3 back and an additional $300 to pay back what was taken." The same two women appeared at the preliminary examination; one was defendant's sister, Christina Badger.

McConnell pointed them out to an officer and told him "that Ms. Badger said that she could get his things back." One officer testified that Badger had once owned a 2002 Mercury Mountaineer; the police were unable to locate that vehicle. Another testified that Badger's son had been seen driving a Ford Explorer.

Defendant was convicted and sentenced as set forth above and this appeal ensued. After filing a claim of appeal, this Court granted defendant's motion for a *Ginther*[1] hearing to address whether trial counsel was ineffective for failing to call an expert witness regarding eyewitness identifications.[2] On remand, defendant moved for a new trial and the trial court held a *Ginther* hearing where the following relevant evidence was introduced:

Robert Carson testified that he represented defendant in this case, but did not represent him at trial. Carson agreed that eyewitness identification was "a key issue in the case" because there were "several witnesses that were unclear and unable to identify [defendant], but as time went by their recollection got better and better." Carson testified that he briefly thought about consulting an expert on eyewitness identification, but did not follow through, in part because he believed the court was unlikely to approve a request for appointment of an expert at public expense and in part because he withdrew from the case "about three weeks before trial."

Sophia Curry, an attorney with seven years' experience, testified that she was retained by defendant's family and appeared in place of Carson sometime between February 14 and 20, 2014. At that time, she knew that the trial was scheduled for March 4, 2014. Curry testified that she had dealt with shortened trial-preparation periods before and did not feel that she needed more time to prepare for defendant's trial.

Curry knew that all the victims were white and defendant is African American. Curry agreed that eyewitness identification was an issue in the case. Curry testified that, based on the discovery materials, she was aware of "the non-identification, o[f] the misidentification, o[f] the discrepancies . . . at the Preliminary Examination transcript, the discrepancies in picking out . . . Mr. Cowan." Curry did not consult with an expert on eyewitness identification, did not retain such an expert, and did not request funds with which to retain one in part because she believed that the lack of a "proper police investigation" was a "bigger issue" than identification, and in part because she "did not believe that an expert would really assist a jury any more than the defense I had prepared." Curry was also concerned about the potential "conflict" that could result if she called an expert to attack the victims' identification of defendant when there was evidence that one of defendant's family members tried to induce the victims not to testify by offering to return their property.[3]

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[2] *People v Cowan*, unpublished order of the Court of Appeals, entered February 10, 2015 (Docket No. 321937).

[3] The record shows that Carson filed a combined witness list and notice of alibi defense; Christina Badger was one of the named witnesses. Curry noted that after learning about the offer

Curry testified that she prepared a defense to address the identification issue by "read[ing] articles on effective cross-examination in eyewitness identification cases," including an article about "the special challenges posed by cross-racial identification" and articles addressing the effect of traumatic events on identification. Curry also reviewed the photographic arrays shown to the victims, read the witness statements, and considered the "the timing of identification," presumably meaning that the victims did not identify defendant at the first opportunity. Curry stated that she did not need an expert to undermine the victims' in-court identification of defendant, given that they were "the same people [who] couldn't identify him before[.]" In other words, the problems with the identification testimony could be elicited through cross-examination of the victims and could be understood by the jury without an expert's assistance because they were "obvious." An added consideration was the fact that presenting an expert to explain "a fairly obvious issue" and "point out the same things that I've pointed out" creates a risk offending, boring, or turning off the jury.

Colleen Seifert, Ph.D., a psychology professor at the University of Michigan, was qualified as an expert in the field of memory as it relates to eyewitness identifications. Seifert testified that she reviewed "the discovery documents," police reports, the photographic arrays, "the preliminary trial information," and the trial transcripts. Based on her review of those materials, she concluded that expert testimony about eyewitness identification would have been appropriate in this case and she would have testified for the defense had she been available at the time of trial. She believed that it was not clear at trial that the victims did not immediately identify defendant during the photographic lineup and only identified him later in court.

Seifert indicated that a jury might have given less weight to the identification testimony had it heard from an expert about scientific studies showing that in-court identification lacks "probative value" because "it's evident to anybody who the defendant is so it's not an identification" based on actual recognition. Seifert opined that her testimony would have provided "a way to help the jury understand how does memory work and how is it different from how I think it works" and would have explained "the pitfalls of human memory and how memory changes over time . . . ." She acknowledged that her testimony "doesn't tell them [the jurors] whether the witness is accurate or not, it just tells them what to consider when they're thinking about whether the witness is accurate." While some problems with memory and identification are matters of common sense, the mere fact that identification evidence is presented "does influence your judgment. You need to be on the alert for it to influence you, and when you warn people like that, they are able to more accurately set aside information that biases them."

The trial court issued an opinion and order denying defendant's motion for a new trial. The trial court reasoned that trial counsel recognized the eyewitness identification issues in the case, conducted research about the issues, and concluded that she "did not believe an expert was necessary to state the obvious and explain what is basic common sense." Instead, counsel concluded that she could deal with the identification issues by cross-examining the witnesses. Furthermore, counsel determined that attacking the police investigation was a stronger defense

to return the stolen property, she abandoned defendant's proposed alibi defense because Badger, who would have provided the alibi, also made the offer to return the stolen property.

and she had to balance the available defense theories after a relative of defendant offered to bribe the victims. The trial court found that defendant failed to show that counsel's performance fell below an objective standard of reasonableness.

The trial court also concluded that defendant could not show that counsel's failure to call an expert prejudiced the defense, explaining in part,

> Expert testimony in this context only bears on the credibility and weight to be given to the identifications in light of all the other evidence in the case. It does not bear directly on the accuracy of a particular identification. The possibility of additional evidence being presented that goes only to a witnesses [sic] credibility when credibility is already at issue is not sufficient to cause a loss of confidence in the jury's verdict. Defense expert eyewitness identification testimony is not generally regarded as impeachment evidence because it does not directly contradict the witness testimony, it only questions its reliability and weight.

> Because Defendant has failed to show that counsel's decision was objectively unreasonable and because Defendant has failed to establish the alleged error has deprived him of a substantial defense he has failed to establish his counsel was constitutionally ineffective.

On return from remand, defendant argues that the trial court erred in denying his motion in addition to raising other arguments related to the proceeding.

## II. ANALYSIS

Defendant first argues that the trial court erred in denying his motion for a new trial because trial counsel rendered ineffective assistance of counsel by failing to call an expert in eyewitness identification testimony.

We review a trial court's ruling on a motion for a new trial for an abuse of discretion. *People v Russell*, 297 Mich App 707, 715; 825 NW2d 623 (2012). Whether a defendant has been denied effective assistance of counsel is a mixed question of fact and law. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). The trial court's factual findings, if any, are reviewed for clear error, while questions of law are reviewed de novo. *Id*.

To establish ineffective assistance of counsel, a defendant must "show both that counsel's performance fell below objective standards of reasonableness, and that it is reasonably probable that the results of the proceeding would have been different had it not been for counsel's error." *People v Frazier*, 478 Mich 231, 243; 733 NW2d 713 (2007).

"An attorney's decision whether to retain witnesses, including expert witnesses, is a matter of trial strategy." *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009). "Ineffective assistance of counsel may be established by the failure to call witnesses only if the failure deprives defendant of a substantial defense." *People v Julian*, 171 Mich App 153, 159; 429 NW2d 615 (1988). "A substantial defense is one that might have made a difference in the outcome of the trial." *People v Kelly*, 186 Mich App 524, 526; 465 NW2d 569 (1990).

Our Supreme Court has explained that "questions of eyewitness identification, fading memories, witnesses' body language, and the like involve obvious human behavior from which jurors can make 'commonsense credibility determinations'" and thus expert testimony is not necessary. *People v Kowalski*, 492 Mich 106, 143; 821 NW2d 14 (2012) (footnote omitted).

In this case, with respect to Curry,[4] her failure to consult and retain an expert was not objectively unreasonable under the circumstances of this case, where the potential unreliability of the witnesses' identification testimony was effectively examined during the trial. Only three of the five witnesses, Scott, McConnell, and Milligan, identified defendant as the gunman. Thus, the jury was free to consider that two of the witnesses could not make a positive identification. Of the three witnesses who claimed to have seen the gunman's face, Scott and Milligan initially identified the wrong man at a photographic lineup. Milligan was almost certain of her identification of the wrong man. Scott changed his mind and identified defendant, but admitted that he was not certain of his identification. McConnell was unable to identify anyone at a photographic lineup. McConnell and Milligan, the two witnesses who did not identify defendant in the photographic lineup, first identified him in court.

An expert could not have opined on whether the eyewitness identifications were right or wrong. The most she could have done was give the jury things "to consider when they're thinking about whether the witness is accurate." However, defense counsel was able to do that by cross-examining the witnesses about their uncertainties and wavering identifications and by highlighting those matters during closing argument. Counsel thoroughly presented and explored the problems inherent with the witnesses' identifications of defendant and the jury was free to consider the uncertainty and inconsistencies in the testimony in its credibility determinations. In addition, counsel advanced the theory that the investigation was inadequate and determined that this theory was stronger than the issues involving the eyewitnesses. Given counsel's thorough cross-examination of the witnesses and pursuit of alternative defense theories, we cannot conclude that her failure to present expert testimony fell below an objective standard of reasonableness or deprived defendant of a substantial defense. *Frazier*, 478 Mich at 243.

Next, defendant argues that the trial court violated his Sixth Amendment right to a jury when the court increased his recommended minimum sentencing range based on judicial fact-finding. We review this constitutional issue de novo. *LeBlanc*, 465 Mich at 579.

Defendant's Sixth Amendment challenge is governed by our Supreme Court's recent decision in *Lockridge*, ___ Mich at ___. In *Lockridge*, our Supreme Court addressed whether "a judge's determination of the appropriate sentencing guidelines range . . . establishes a 'mandatory minimum sentence,' such that the facts used to score the offense variables must be admitted by the defendant or established beyond a reasonable doubt to the trier of fact. . . ." Slip op. at 5-6 n 11. The *Lockridge* Court answered this question in the affirmative, holding that the sentencing guidelines violated the rule set forth in *Alleyne v United States*, 570 US___; 133 S Ct 2151; 186 L Ed 2d 314 (2013). *Id*. at 1-2. Specifically, the guidelines were constitutionally

---

[4] Defendant's argument focuses on Curry and her representation at trial; therefore, we address this issue as a claim that Curry, not Carson, was ineffective.

deficient "[to] the extent to which the guidelines require judicial fact-finding beyond facts admitted by the defendant or found by the jury to score [OVs] . . . that mandatorily increase the floor of the guidelines minimum sentence range, i.e. the 'mandatory minimum' sentence under *Alleyne*." *Id*.

To remedy this deficiency, the *Lockridge* Court made the sentencing guidelines advisory only and struck down the requirement in MCL 769.34(3) "that a sentencing court that departs from the applicable guidelines range must articulate a substantial and compelling reason for that departure." *Id*. at 2. Henceforth, "a sentencing court must determine the applicable guidelines range and take it into account when imposing a sentence . . . [however] a guidelines minimum sentence range . . . is advisory only and . . . sentences that depart from that threshold are to be reviewed by appellate courts for reasonableness." *Id*. Stated differently, a trial court may engage in judicial fact finding[5] to score the OVs, however, the resulting recommended minimum sentencing range is no longer binding on the court, but rather is advisory only. The court may impose a sentence that it deems reasonable and it need not articulate substantial and compelling reasons for departing from the guidelines' recommended sentencing range.

By finding defendant guilty of felony-firearm, the jury necessarily determined that defendant possessed a gun, which supports the five-point score for OV 2. MCL 777.32(1)(d). However, while there is evidence to support the trial court's scoring of OVs 1, 3, 4, 12, and 19, the jury did not find these facts beyond a reasonable doubt because they were not elements of the charged offenses. Therefore, because defendant did not admit these facts, the sentencing court engaged in judicial fact-finding to score the OVs. Accordingly, because those facts established the guidelines' minimum sentencing range, "an unconstitutional constraint [on the judge's discretion] actually impaired the defendant's Sixth Amendment right." *Lockridge*, ___Mich at___ (Slip op. at 32).

The *Lockridge* Court explained the remedy for this violation as follows:

> Thus, in accordance with [*Crosby*, 397 F3d at 117-118] . . . in cases in which a defendant's minimum sentence was established by application of the sentencing guidelines in a manner that violated the Sixth Amendment, *the case should be remanded to the trial court to determine whether that court would have imposed a materially different sentence but for the constitutional error.* If the trial court determines that the answer to that question is yes, the court shall order resentencing. [*Id*. at 34 (emphasis added).]

In this case, defendant's minimum sentence was established by application of the sentencing guidelines in a manner that violated the Sixth Amendment. Accordingly, we remand this case to the trial court for a determination of whether the court would have imposed a materially different sentence had it been aware that the guidelines' recommended minimum sentencing range was advisory as opposed to mandatory. If the answer to this inquiry is yes,

---

[5] Indeed, trial courts must continue to score the OVs, assessing the highest number of points supported by the facts. See Slip op. at 29 n 28, citing MCL 777.21(1)(a).

then the trial court must resentence defendant. If the answer to this inquiry is no, then defendant is not entitled to resentencing. As set forth by this Court in *People v Stokes*, ___ Mich App; ___ NW2d ___ (2015) (Docket No.321303), we remand the matter to the trial court to follow the *Crosby* procedure in the same manner as outlined in *Lockridge* for unpreserved errors. Defendant may elect to forego resentencing by providing the trial court with prompt notice of his intention to do so. If notification is not received in a timely manner, the trial court shall continue with the *Crosby* remand procedure as explained in *Lockridge*.

## III. STANDARD 4 BRIEF

Finally, in a late-filed Standard 4 brief incorrectly labeled as a motion for a new trial in the trial court, defendant raises several arguments. We review these unpreserved claims for plain error affecting defendant's substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999).

Defendant argues that the prosecution filed an untimely "notice to seek enhancement of sentence" in violation of MCR 6.112(F), which in turn, deprived him of "a fair and impartial probable cause determination." This argument lacks merit. MCR 6.112(F) requires that a habitual offender notice be filed "within 21 days after the defendant's arraignment on the information . . . or, if arraignment is waived, within 21 days after the filing of the information." Here, the register of actions indicates that the arraignment occurred on January 9, 2014. A habitual offender notice was included in the November 27, 2013, felony complaint, the November 29, 2013, felony warrant, and the January 3, 2014, information. Accordingly, defendant was notified of the potential enhanced sentence within the timeframe required under MCR 6.112(F).

Next, defendant appears to challenge the magistrate's probable cause determination to support the issuance of the arrest warrant. This argument also fails. Here, the felony complaint listed the charged offenses, the statutory citations for the charges, the factual predicate for the charges, and was sworn before the magistrate. The complaint therefore satisfied the basic requirements of MCR 6.101(A). Similarly, the magistrate's probable cause determination to issue the warrant was not erroneous. A finding of probable cause is proper where the complaint and supporting facts are sufficient to allow the magistrate "to make the judgment that the charges are not capricious and are sufficiently supported to justify bringing into play further steps of the criminal process." *Jaben v United States*, 381 US 214, 224-225; 85 S Ct 1365; 14 L Ed 2d 345 (1965). Probable cause to support an arrest "looks only to the probability that the person committed the crime as established at the time of arrest" without regard to whether the prosecution can ultimately prove guilt at trial. *People v Cohen*, 294 Mich App 70, 76; 816 NW2d 474 (2011) (citation omitted). Here, the complaint listed the items alleged to have been stolen, the date and location of the alleged offenses, the names of the victims, and the nature and circumstances surrounding the alleged offenses. This was sufficient information to allow the magistrate to find probable cause to issue the arrest warrant.

Defendant next argues that a pretrial photographic lineup was "unduly suggestive" in violation of his due process rights.

"The fairness of [an] identification procedure must be evaluated in the light of the totality of the circumstances. The test is the degree of suggestion inherent in the manner in which the suspect's photograph is presented to the witness for identification." *People v Lee*, 391 Mich 618, 626; 218 NW2d 655 (1974). An identification procedure violates due process "when it is so impermissibly suggestive that it gives rise to a substantial likelihood of misidentification." *People v Gray*, 457 Mich 107, 111; 577 NW2d 92 (1998). Improper suggestiveness often arises where a witness is shown only one person or a group of people where one person is singled out in some way. *Id.*

Defendant contends that police used a photograph of a man named Bernard in the lineup after defense counsel objected to that photograph. This argument is not supported by the record. Instead, Detective Chris Frazier testified at trial as follows:

> *Q.* Can you describe for the ladies and gentlemen of the jury that process of how you make the determination to admit these or to use these photos?
>
> *A.* In this particular lineup after the corporeal lineup did not proceed, there was a Defense Attorney there, the Prosecutor was there, and the photos that we used in this lineup were the individuals that were going to be in the corporeal lineup . . . So the Defense Attorney, Prosecutor, reviewed the photographs of these potential people in the corporeal. The Prosecutor was fine. *The Defense objected to one of the individual's pictures so that was taken out. I then prepared a lineup from the approved photos from both of these attorneys.* [Emphasis added.]

Thus, contrary to defendant's argument, the record supports that the photographic array contained only photographs approved by defense counsel. Furthermore, as discussed below, the photo array as a whole was not unduly suggestive.

Defendant also contends that the photograph array violated due process because Frazier admitted that some of the photographs were of individuals with dark complexions, which contrasted with defendant's lighter complexion. However, although the photographic array contained some photographs of individuals with darker complexions than defendant, this did not render the array impermissibly suggestive. As noted, defense counsel agreed to the photographs that were used and only some of the individuals had darker complexions than defendant. Other individuals had lighter complexions like defendant. Thus, the array as a whole did not improperly single defendant out and it was not "so impermissibly suggestive that it [gave] rise to a substantial likelihood of misidentification." *Gray*, 457 Mich at 111. Accordingly, because the array was not conducted in a manner that violated defendant's due process rights, his arguments regarding its admission at trial and cumulative error also fail as a matter of law.

We affirm defendant's convictions and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Stephen L. Borrello
/s/ Kathleen Jansen
/s/ Donald S. Owens