# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellant,

UNPUBLISHED
December 8, 2016

v

ELISAH KYLE THOMAS,

    Defendant-Appellee.

No. 326311
Wayne Circuit Court
LC No. 14-009512-FC

Before: GADOLA P.J., and SERVITTO and SHAPIRO, JJ.

SHAPIRO J. (*dissenting*).

I respectfully dissent. The trial court conducted a thorough evidentiary hearing, made factual findings as to the totality of the circumstances consistent with the evidence and correctly applied the law. We should affirm its conclusion that the identification procedure employed in this case was unduly suggestive.

The purpose of requiring that the police and prosecution employ proper identification procedures is not to make the process of justice more difficult; it is to make it easier. Early identifications based on *reliable* procedures contribute greatly to the truth-finding process. Early identifications based on *unreliable* procedures, however, like those used in this case, greatly complicate and compromise the truth-finding process.[1]

As the majority observes, the method of identification employed in this case "is considered to be one of the most suggestive." Nevertheless, the majority goes on to conclude that considered within the "totality of the circumstances," the procedure was not unduly suggestive. In reaching its conclusion, the majority opinion, rather than deferring to the trial court's factual findings, deemphasizes or overlooks the factual circumstances that the trial court found most salient. The majority explains its willingness to downplay the trial court's factual findings by stressing that the ultimate issue before us is a question of law. However it errs in two respects here as well. First, the majority opinion fails to set forth a thorough analysis of that law. Second, the majority loses sight of the fact that the answer to a question of law governed by the

---

[1] "[T]he primary objective of procedural rules should be to facilitate the discovery of truth. . . . [T]ruth must be the goal of any rational procedural system[.]" Grano, *Implementing the Objectives of Procedural Reform: The Proposed Michigan Rules of Criminal Procedure—Part 1*, 32 Wayne L Rev 1007, 1011 (1986).

"totality of the circumstances" must be reached in the context of the findings as to what those circumstances were and not merely in some abstract fashion.

## I. FACTS

Mr. Dykes, the complainant in this case, was robbed at gunpoint on the night of October 17, 2014, outside Micky D's Coney Island at Seven Mile and Greenfield in Detroit. The robber stood about two feet from him and pointed a 9 mm handgun at his chest and demanded money. Dykes handed the robber $10, but the robber demanded more money and fired two shots, one into the ground and one into the air. Dykes began to run and the robber chased him, firing four more shots. The last shot hit Dykes in the leg, but he was able to keep running and eventually reached a nearby place of safety where someone called 911.

Dykes was transported to the hospital and, while waiting to be seen by a doctor, was approached by Detroit Police Officer Samilia Howell. Howell showed him a photo of a man on her cell phone screen and asked him if he was the man that had robbed him. Dykes answered affirmatively. The police arrested defendant. He was charged with armed robbery, assault with intent to murder or to do great bodily harm, and carrying a dangerous weapon with unlawful intent. He was bound over on those charges on October 31, 2014.

Defendant brought a pretrial motion to suppress the identification acquired by Officer Howell on the grounds that it was obtained through an improperly suggestive procedure. The trial court conducted an evidentiary hearing at which there were three witnesses: Dykes, Officer Howell, and Investigator Glenda Fisher, the officer in charge of the case.

At the evidentiary hearing, Dykes testified that his assailant was a young black man wearing all black and wearing a thin, zipped up jacket with the hood up. Because of the hood, Dykes stated that he was only able to see the man's face from eyebrows to chin and could not see the man's hair or ears. He stated that he looked at the robber from about two feet away for six or seven seconds and that about ten minutes before the robbery he had passed the same hooded man on the street at which time he had glanced at him for about three seconds. He testified that on both occasions it was dark, there were no street lights, and he had never seen his assailant before that night. Dykes also stated that he told the first responders that the robber was dark skinned and about the same height and weight as himself, i.e. 5'9" and 145 pounds.[2]

As to the identification procedure at the hospital, Dykes recalled that while he was still bleeding, an officer showed him a photo on her cell phone screen and asked "is this the person who shot you" and that he responded that it was.

During the evidentiary hearing, Dykes was shown a printed enlarged copy of the photo of defendant and confirmed that it was a copy of the screenshot he had been shown by the officer.[3]

---

[2] During the evidentiary hearing, the trial court asked defendant how tall he was and he stated he was 5'8" or 5'9" inches.

[3] The print contained in the record measures 7.25" x 5.25" and so has an area of 38 inches. The officer testified that she was using an iPhone4s; such a device has a screen size of nearly 3" x 2" and so has an area of 6 inches. For clarity, I will refer to the photo as it appeared on the phone as

-2-

The enlarged print shows defendant from the chest up, at an oblique angle somewhere between front facing and profile. In the enlarged print, defendant is shown to be a dark-skinned male with a goatee, sideburns, and a faint moustache.

During Dykes's direct-examination, the prosecutor showed him the enlarged print after which Dykes testified that he recalled his assailant had facial hair. On cross-examination, defense counsel brought out that this testimony was inconsistent with his testimony at the preliminary examination when Dykes stated that he could not see if his assailant had facial hair. The relevant portion of the cross-examination reads:

*Q*. And you could see facial hair on him and everything?

*A*. Yes.

*Q*. You could see a moustache or a beard on him, or—what did you see.

*A*. I could see . . . from the chin, all the way up to the forehead and part of his cheeks.

*Q*. And on that date did he have facial hair?

*A*. Yes.

*Q*. You could see it?

*A*. Yes.

*Q*. Do you previously remember testifying in this case?

*A*. Yes.

*Q*. You previously remember testifying that you couldn't see his facial hair?

*A*. No.

[the witness is shown the preliminary examination transcript]

*Q*. Can you flip open to page 16, sir?

Did you have a chance to read page 16?

*A*. Yes.

---

the "screenshot" and the enlarged printed copy used at the hearing and contained in the record as the "enlarged print." The screenshot does not appear to have ever been shown in the courtroom as it is not referenced at the preliminary hearing or at the evidentiary hearing.

*Q. Now do you remember saying you couldn't really see his facial hair?*

*A. Yes.*

*Q. So could you see his facial hair or not?*

*A. I—no, not really.* [Emphasis added.]

On redirect, the prosecution attempted to rehabilitate this inconsistency:

*Q. As you're seeing the person who is robbing you and then is about to shoot you, were you more focused on—there were three things we talked about, there was the face, there was the gun and there was his clothing. Of those three things, what was the thing you were most focused on during those six or seven seconds?*

*A. All three.*

*Q. Now, at the preliminary examination on cross-examination you were asked the question whether you testified that you couldn't really see his facial hair; is that right?*

*A. Yes.*

*Q. Do you remember testifying that you weren't sure if he had facial hair or not?*

*A. Yes.*

*Q. As you're sitting here today, now that you've had time to reflect on things, do you remember if he had facial hair or not?*

*A. Yes.*

*Q. And to your recollection, did he have facial hair at the time?*

*A. Yes.*

The second witness at the hearing was Officer Howell, the officer who obtained the identification. She testified that she arrived at the crime scene after other officers and was there when the ambulance left with Dykes. The description of the robber given to her by police radio was a "black male wearing dark clothing, youthful appearance." The description given to her at the scene made no reference to facial hair.

Howell testified that she began to canvass the area for anyone fitting the description and saw defendant standing on the sidewalk about 50 feet from the shooting site with another person. She noted that defendant was a young black male wearing all black. She stopped him and asked him his name. She patted him down for weapons and found none. She then ran defendant's name through the LIEN system which revealed that defendant had no criminal convictions and

no outstanding warrants. Before releasing him, she took a photo of defendant on her cell phone in order to show it to Dykes "to see if this was the guy who actually shot him."

Howell and her partner went to the hospital, located Dykes, and "started talking to him in regards to what happened." She testified that when asked to describe his assailant, Dykes stated that the robber "was a black male . . . five nine, 200 pounds, . . . between 15 and 20 [years old]" and that "he knew him from the neighborhood." She testified that he did not mention facial hair.

As to the identification procedure, Howell testified that while Dykes was lying on a hospital bed[4] she showed him the cell phone screenshot and asked "was this the guy that shot you?" She did not give him any of the instructions set forth in Detroit Police Department policy such as: that he could take as much time as he needed to look at the photo and that the photo might be or might not be of the robber. She stated that "within seconds" Dykes answered affirmatively and began to cry.

When asked why she showed Dykes the photo, Howell testified, "To make sure the picture I showed was the actual perp, not just a regular guy. Like I wanted to get a little bit more in detail, like, as far as what he looked like, you know."

Howell appeared to have little, if any, knowledge of Detroit Police Department's photo identification procedures, although she was aware that the department has no procedure for showing a cellphone screenshot to a complainant. She stated that in her 12 years as a patrol officer she had never conducted a photo lineup and was "not that familiar" with policies concerning "mug shot[s], six packs, showups and whatnot."

Howell was asked if she "[said] anything to influence his selection of the picture" and she answered, "it was only one picture."

The next witness was Investigator Fisher, the officer in charge of the investigation. Fisher testified that the standard procedure in conducting a photo identification is a "six-pack" photo lineup, and she described the process of preparing and presenting one as provided by department policies. She stated that before showing the witness the six photos she "tell[s] them I'm showing you a group of pictures, the person may or may not be in there. Take your time. If you see somebody you recognized, tell me what number they are and where you recognize them from." She also testified that officers are to assemble the six-pack so as to not single anyone out. When asked, "what's the procedure for showing one picture to somebody" she responded, "There's no procedure. I don't know of any policy for that." She further testified:

> *Q.* Does showing somebody one picture on a cellphone single out a person?
>
> *A.* It would be for that single person.
>
> *Q.* So, yes?

---

[4] Dykes testified that at the time he was shown the screenshot he was being wheeled to a room.

*A.* Yes.

*Q.* In your 20 years as a Detroit Police Department officer, have you ever taken a picture with your cellphone and shown it to a victim?

*A.* Not that I can recall.

The trial court issued a written opinion granting defendant's motion. In its opinion, the court found that "the assault happened quickly, in the dark, by an unknown person whose description [Dykes] shifted subtly between the preliminary examination and the evidentiary hearing." The court found that fifteen minutes before the assault, Dykes saw his assailant for about three seconds. The court further found that Dykes saw his assailant during the assault for six or seven seconds and that both views occurred at night in an area with no streetlights.

The trial court ultimately found that the use of a single photograph was impermissibly suggestive under the totality of the circumstances because it gave rise to a substantial likelihood of misidentification. It provided a thorough analysis, reasoning in part:

> A photographic identification procedure violates a defendant's right to due process of law when it is so impermissibly suggestive that it gives rise to a substantial likelihood of misidentification. *People v Gray*, 457 Mich 107, 111, 577 NW2d 92, 94 (1998), citing, *People v Kurylczyk*, 443 Mich 289, 302, 505 NW2d 528 (1993) [(opinion by GRIFFIN, J)]; *Simmons v United States*, 390 US 377, 384, 88 S Ct 967, 971, 19 L Ed2d 1247 (1968). When a witness is shown only one person or a group in which one person is singled out in some way, the witness is tempted to presume that he is the person. *People v Anderson*, 389 Mich 155, 178, 205 NW2d 461, 470 (1973). The exhibition of a single photograph is "one of the most suggestive photographic identification procedures that can be used." *Gray*[,] at 111, 577 NW2d at 94, citing, Sobel, Eyewitness Identification (2d ed), §5.3(f), page 5-42. The United States Supreme Court has stated that the risks inherent in identification are not the "result of police procedures intentionally designed to prejudice an accused", but rather derive "from the dangers inherent in eyewitness identification and the suggestibility inherent in the context of pretrial identification". [*United States v*] *Wade*[, 388 US 218,] 235, 87 S Ct [1926,] 1936[; 18 L Ed 2d 1149 (1987)].

> The People submit that, because the cell phone photo of the defendant was shown to Mr. Dykes within an hour of the assault, the victim's identification by way of this sole photograph was the functional equivalent of a "showup", as was the subject in the case of *Stovall v Denno*, 388 US 293, 87 S Ct 1967, 18 L Ed2d 1199 (1967). The *Stovall* court, while upholding the victim's identification of her assailant at an in-hospital "showup", recognized that "the practice of showing suspects singly to persons for the purpose of identification" has been "widely condemned." *Id.* at 301, 388 S Ct 1972. The *Stovall* court explained that a claimed violation of due process of law depends "on the totality of the circumstances surrounding it". *Id.* The Court noted the need in the case before it for immediate action, that the victim

might die, and that bringing the defendant to her was the only "feasible procedure". *Id.*

In the case at hand, however, the People do not cite to any case law that explicitly equates a photographic identification with a "showup", and this court declines to do so in the absence of precedent. Additionally, this case does not present the mortal exigency critical to the analysis in *Stovall.* Further, after an extensive review of the law on identification procedures, this court is unable to find any support for the proposition that temporal proximity between the crime and the exhibition of a single photograph, by itself, overcomes the constitutional infirmity of impermissible suggestiveness.

## II. STANDARD OF REVIEW

"A trial court's determination in a suppression hearing regarding the admission of identification evidence will generally not be reversed unless clearly erroneous." *People v McDade,* 301 Mich App 343, 356; 836 NW2d 266 (2013). "Clear error exists when the reviewing court is left with a definite and firm conviction that a mistake was made." *Id.* The clear error standard is deferential to the trial court "because the trial court is usually in a superior position to assess the evidence." *People v Zahn,* 234 Mich App 438, 445; 594 NW2d 120 (1999). Due regard must be given to the "special opportunity of the trial court to judge the credibility of the witnesses who appeared before it." MCR 2.613(C).

In reversing the trial court, the majority suggests that because the ultimate issue is one of law we need not defer to the trial court's factual findings. However, when a court is addressing a legal question that turns on the totality of the circumstances rather than some bright line rule, it must in the first instance determine what are the factual circumstances that, when considered together, make up the totality of the circumstances. "Under a totality test, a court looks at the the totality of the circumstances[;] . . . [e]very *fact* that has any relevance is taken into consideration . . . ." *People v Conte,* 421 Mich 704, 729; 365 NW2d 648 (1985).[5] (Emphasis added.)

Here, the trial court's findings as to the circumstances of the identification procedure were fully consistent with the evidence. Indeed, the majority opinion fails to identify any of the underlying findings that it believes were clearly erroneous. Nor does it state that it is "left with a definite and firm conviction that a mistake was made." We are, therefore, bound by the trial court's factual findings.

## III. TOTALITY OF THE CIRCUMSTANCES

The question before us is, based on the factual findings of the trial court, whether it was legal error for that court to conclude that the identification procedure was unduly suggestive. The inquiry does not end merely because some facts support a finding of reliability. Indeed, it would be difficult to imagine a case where all the circumstances weigh against reliability – the

---

[5] According to *Merriam-Webster's Collegiate Dictionary* (11th ed), "circumstance" is defined as "a condition, fact or event."

mere fact that the witness says he saw his assailant is a factor in favor of reliability. The issue is whether the degree of reliability suggested by those factors is sufficient to *outweigh* the unreliability created by the suspect identification method. In *Neil v Biggers*, 409 US 188, 199; 93 S Ct 375; 34 L Ed 2d 401 (1972), the United States Supreme Court held that a reviewing court must consider "whether under the 'totality of the circumstances' the identification was reliable *even though* the confrontation procedure was suggestive." (Emphasis added.) In other words, the other circumstances must be so demonstrative of reliability so as to justify disregarding the danger of mistaken identification that is inherent when it is obtained by display of a single photo.

The majority further errs in its discussion of the totality of the circumstances by understating the degree of suggestibility inherent in the method by which Howell obtained the identification and by overstating the degree to which other circumstances mitigate the highly suspect nature of the procedure.

### A. STRANGER IDENTIFICATION BY A SINGLE PHOTOGRAPH

Dykes's assailant was a stranger to him, i.e. not a family member, friend, acquaintance, or someone he recognized for some other reason. He could not, therefore, tell the police who robbed him; all he could do was provide a description and then participate in viewings of possible suspects to see if he recognized any of them as his assailant.

In stranger identification cases, there are three procedures, which when administered properly, are generally recognized as reliable in our caselaw: a live (corporeal) lineup, a photographic lineup, and a live (corporeal) showup. While challenges may be posed to the manner in which these methods are performed, in most cases of record, they have been upheld.[6] Of these methods, the live showup appears to be rarely employed (there are few cases of record in which it was used), and it is viewed with skepticism. In *Stovall*, a live showup case, the

---

[6] In the last decade, the importance of proper administration of identification procedures has been more fully recognized. In 2012, two reports were issued by the State Bar of Michigan Eyewitness Identification Task Force, a body which included among its members prosecutors, defense attorneys, trial judges and appellate judges. Its report titled "Law Enforcement and Eyewitness Identifications: A Policy Writing Guide" was intended to provide guidance in formation of police policies and training materials. State Bar of Michigan, *Law Enforcement and Eyewitness Identification: A Policy Writing Guide,* p 2. It provided a detailed set of guidelines to minimize the risk of misidentification when conducting live lineups, photographic lineups and corporeal showups. *Id*. at pp 3-8. Notably, it did not suggest any circumstances in which a single photo procedure was acceptable and provided no procedures that might assure the reliability of such a procedure. Its other report, entitled "Prosecutor Eyewitness Identification Training Guide" noted that "if there is minimal or no circumstantial evidence to support a witness or witness's identification in a stranger situation, *extreme caution* must be taken due to the possibility of misidentification" State Bar of Michigan, *Prosecutor Eyewitness Identification Training Guide*, p 1(emphasis added). It similarly provides extensive direction as to how to assure the integrity and accuracy of these three procedures and similarly makes no reference to single photo procedures. *Id*. at pp 1-4. See also *People v Blevins*, ___ Mich App ___, ___; ___ NW2d ___ (2016) (Docket No. 315774) (SHAPIRO, J, dissenting); slip op at 7.

-8-

United States Supreme Court stated that "[t]he practice of showing suspects singly to persons for the purposes of identification, and not as part of a lineup, has been widely condemned." *Stovall*, 388 US at 302.

In this case, none of these identification methods were used. Instead, Officer Howell simply showed complainant a single photo, which the majority, citing *Gray*, 457 Mich 107, recognizes is "one of the most suggestive photographic identification procedures that can be used." This is because when a witness is a shown only a single person, he is "tempted to presume" that the person shown is the person who committed the crime. *Id*. at 111 (Citation and quotation marks omitted).

There is not a single case in Michigan jurisprudence in which the prosecution has been permitted to introduce a one photo identification of a stranger. The majority opinion overlooks this because it does not fully examine several of the cases on which it relies. First, it cites *People v Woolfolk*, 304 Mich App 450; 848 NW2d 169 (2014), which was not a stranger identification case. The witness in that case knew the defendant well and had already identified the defendant by name *before* the photo was shown. *Id*. at 457-458. Second, the majority errs in its description of the holding in *People v McAllister*, 241 Mich App 466; 616 NW2d 203 (2000). The *McAllister* Court did not, as the majority states, "conclude[] that the showing of a single photo of the defendant was suggestive, but permissible." Rather, it held that the witness's in-court identification of the defendant was admissible because it was untainted and independent of what it termed the "improperly conducted" pretrial identification which was not admitted. *Id*. at 471-472. Third, in *People v McRaft*, 102 Mich App 204, 211-212; 301 NW2d 852 (1980), there was no challenge to the methodology of the photographic lineup, only a claim that the witness was too ill at the time for his selection of the defendant's photo to have been reliable.

There is a second factor that is also relevant to the reliability of an identification procedure, i.e. the manner in which it is administered. It is well-recognized that even identification procedures that are generally acceptable may be rendered unreliable due to poor administration.[7] In this case, not only was the chosen procedure unreliable, the manner in which the officer administered it made it even more unreliable. There was substantial testimony from Investigator Fisher about the mechanisms for doing so, such as telling the witness to take his time and to look at each photo carefully, affirmatively advising the witness that the photo may not be of the assailant, and, if an identification is made, asking the witness for their degree of confidence. Howell had never conducted a photo identification before and had no training in how to do so in order to minimize identification errors. Her ignorance of these safeguards yielded a particularly bad exercise of what was, in the most capable of hands, a highly unreliable

---

[7] See, e.g., *Simons v United States*, 390 US 377, 383; 88 S Ct 967; 19 L Ed 2d 1247 (1968) ("It must be recognized that improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals."); and *Foster v California*, 394 US 440, 443; 89 S Ct 1127; 22 L Ed 2d 402 (1969) (holding that due process required the exclusion of an eyewitness identification obtained through police-arranged procedures that "made it all but inevitable that [the witness] would identify" defendant as the perpetrator.) See also State Bar of Michigan, *Law Enforcement and Eyewitness Identifications: A Policy Writing Guide*, pp 3-6 (detailing proper administration for photo lineups, corporeal lineups, and corporeal showups.)

methodology. The majority observes that Howell refrained from saying something like "we arrested this guy" or "we think this is the guy" and instead simply asked "is this the guy?" However, it never explains how the question "is this the guy" is somehow different in effect when the officer had only one photo to show.[8]

## B. THE OTHER CIRCUMSTANCES

The majority cites *Neil*, 409 US 188 and Justice GRIFFIN'S opinion in *Kurylczyk*, 443 Mich 289, for the principle that the court is to consider factors other than the validity of the identification procedure itself. However, neither case involved single photo identifications. In *Neil*, the identification procedure was an in-person live showup. *Neil*, 409 US at 195. In *Kurylczyk*, it was a photographic lineup with a six photo array. *Kurylczyk*, 443 Mich at 293. Accordingly, it is far from clear whether it is even proper to consider factors other than the methodology where the identification being reviewed was based on a single photo.

Nevertheless, a review of the other factors considered by the majority demonstrate that, if anything, they reduce the reliability of this identification rather than increase it.

The first factor referenced by the majority is the witness's "opportunity to view" the perpetrator. While the majority mentions that it was dark at the time of the crime, it fails to take into account the lack of any streetlights and the fact that the assailant was wearing a hood that covered his hair, ears, and part of his forehead and cheeks. It opines that the length of the viewing opportunity was reassuring where the encounter lasted six or seven seconds and there was a prior three second opportunity while the two men passed each other on the sidewalk. By contrast in *Gray*, our Supreme Court unanimously held that a single photograph identification was unduly suggestive under the totality of the circumstances even though the witness had been with her assailant for over an hour during which time he raped her twice and she saw him in both artificial and natural lighting. *Gray*, 457 Mich at 111-114, 117-119.[9] Moreover, in *Kurylczyk*, the Supreme Court upheld admission of identification testimony where the "opportunity to view" the perpetrator was of a different order than in the instant case. There were two witnesses, each of whom identified the defendant as the bank robber. One witness testified that he viewed the bank robber for a period of three to four minutes in the well-lit bank, did not lose sight of him, and saw him from both the side and the front. *Kurylczyk*, 443 Mich at 307. The other witness who was beside the first one, had essentially the same view and watched the perpetrator leave. *Id*. Such a setting contrasts sharply with the view available during a few seconds in the dark.

The second factor referenced by the majority is the witness's degree of attention. Here, there was no evidence that Dykes had reason to be attentive when he and his assailant passed

---

[8] The effect of such a question would likely be different if, for example, the officer told a witness that she was going to show him a series of photos that might be the assailant and with each different one asked "is this the guy?" As Howell pointed out when asked if she did anything suggestive she answered "it was only one picture."

[9] In *Gray*, the Court went on to conclude that even though the identification procedure was invalid, the witness had an independent basis to identify the defendant in court, so her in-court identification was admissible. *Gray*, 443 Mich at 124.

each other on the sidewalk for three seconds some time before the robbery. And during the six or seven second assault Dykes was not only dealing with the stress of a gun pointed at him, he was also getting money out of his pocket and making a decision to turn and run away. He testified that his "adrenalin was up" during the crime in contrast to the witnesses in *Kurylczyk* who testified that they had been trained to remain calm and attentive in the event of a robbery.[10]

The third factor cited by the majority is the accuracy of the witness's prior description of the perpetrator. The majority overlooks the general nature of that description which the trial court concluded "could have described many young men in the area." Moreover, the majority fails to account for the changes in Dykes's descriptions when evaluating reliability, besides mentioning without further explanation, that Dykes gave two different descriptions of his assailant's weight: 145 pounds and 200 pounds. The majority also fails to consider the testimony that at the hospital, before being shown the photo, Dykes told the officers that he "knew [the assailant] from the neighborhood" when he later stated that the man was a stranger. Most significantly, the majority glosses over the repeated changes in description as to facial hair. When asked by police officers at the scene to provide a description, he did not mention facial hair. When asked by different officers at the hospital to provide a description, the complainant did not mention facial hair. At the preliminary examination, where he was not shown an enlarged print of the screenshot, he again stated that he either did not or could not see any facial hair. However, at the evidentiary hearing, having been shown the enlarged print that plainly shows defendant's facial hair, he stated for the first time that his assailant had facial hair. When reminded of his prior testimony he returned to his prior opinion that he did not see any facial hair. However, when questioned again by the prosecution and reminded that "you've had time to reflect on things" he again testified that his assailant did have facial hair. The chronology of his statements about facial hair strongly suggests that his testimony that there was facial hair was based on what he saw in the enlarged print and not what he saw during the robbery. And evaluation of Dykes's testimony is for the trial court whose opinion made reference to the fact that "[the] description by Mr. Dykes shifted subtly between the preliminary examination and the evidentiary hearing."

The next factor is "the degree of certainty demonstrated by the witness at the confrontation." In this case the officer made no inquiry as to the degree of certainty. The majority states that the speed with which the witness gave the identification weighs in favor of certainty, but does not explain its reasoning, and it is difficult to give much weight to a factor that the majority merely states may "*suggest some*" certainty. Nor does the majority consider that the speed may have been due to the fact that there was only one photograph, or Officer Howell's failure to give pre-viewing instructions, or the fact that Dykes was being wheeled to a treatment room while still bleeding from his wound.

The final factor cited by the majority is the relatively short period of time—less than one hour—between the assault and the identification. I agree that taken alone this factor weighs in favor of reliability. However, it is not remotely sufficient to overcome the evidence that weighs against it. As to this factor, the trial court observed: "[A]fter an extensive review on the law on

---

[10] The majority accepts at face value Dykes's testimony that "he got a good look at the assailant's face," but it is the role of the trial court to determine the reliability and credibility of that testimony.

identification procedures, this court is unable to find any support for the proposition that temporal proximity between the crime and the exhibition of a single photograph, by itself, overcomes the constitutional infirmity of impermissible suggestiveness."

For these reasons, I would conclude that the identification in this case was not reliable and the trial court properly excluded it.

## IV. INDEPENDENT IDENTIFICATION

The majority does not address whether the trial court erred by suppressing the in-court identification because it lacked an independent basis. I would hold that the trial court's decision was not clearly erroneous.

Because the photographic identification procedure was improper, the trial court had to hold an evidentiary hearing at which the prosecution must show by clear and convincing evidence that the in-court identification has an independent basis. *Gray*, 457 Mich at 114-115. The independent basis inquiry is viewed in light of the totality of the circumstances. *Id*. at 115. The following eight factors are to be considered: (1) the victim's prior relationship or knowledge of the defendant, (2) the victim's opportunity to observe the offense, including length of the observation, lighting, noise, or other factors affecting perception and proximity, (3) the length of time between the offense and the identification, (4) the accuracy of the victim's description, (5) any previous proper identification or failure to identify the defendant, (6) any identification prior to lineup or showup of another person as the defendant, (7) the nature of the offense and the victim's physical and psychological state, and (8) any idiosyncratic or special features of defendant. *Id*. at 116.

Here, Dykes's prior knowledge of his assailant consisted of a three-second glance as they passed each other; he had no prior relationship or knowledge of defendant. His opportunity to observe the offense lasted seven seconds at the most on an unlit street after dark. Although he was close, his ability to view his assailant was limited by the hood his assailant was wearing and by the fact that his attention was divided between the gun, his assailant's face, and his assailant's clothing. Further, although accurate, his description of his assailant was extremely general. As for Dykes's psychological state, he admitted that his adrenaline was up and that at the hospital he was highly emotional. He was unable to identify any idiosyncratic or special features of defendant. And the changes in his testimony regarding the presence of facial hair demonstrated the fact that his memory was subject to alteration so as to conform to what he saw in the enlarged print. Under these facts, I would hold that the trial court did not clearly err in suppressing any in-court identifications by Dykes.

## V. CONCLUSION

The trial court's findings of fact were not clearly erroneous and its rulings were correct as a matter of law. I would affirm.

/s/ Douglas B. Shapiro

-12-