*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

TINASHE MUZAMHINDO,

        Defendant-Appellant.

UNPUBLISHED
April 16, 2026
10:06 AM

No. 370834; 370855
Kent Circuit Court
LC No. 23-000233-FC;
        23-000235-FC

Before: O'BRIEN, P.J., and FEENEY and WALLACE, JJ.

PER CURIAM.

This case involves two separate bank robberies in Grand Rapids in September 2020 (the first incident) and November 2020 (the second incident). In the first incident, a man claiming to have a gun robbed a bank and then dropped a belted bag while exiting. Deoxyribonucleic acid (DNA) was found on the bag that was determined to belong to four individuals, at least one of which was male. The DNA was further found to be 234 billion times more likely to have come from defendant plus three other people than from four other people that did not include defendant.

Defendant was charged with felonies in case number 23-000235-FC (regarding the first incident) and case number 23-000233-FC (regarding the second incident). The DNA evidence was introduced at trial and a bank teller who was robbed during the second incident testified that she was certain that defendant was the person who robbed her. On February 1, 2024, following a jury trial, defendant was convicted of bank robbery (MCL 750.531) in case number 23-000235-FC, as well as armed robbery (MCL 750.529), bank robbery (MCL 750.531), and habitual offender fourth offense (MCL 769.12(1)) in case number 23-000233-FC. Defendant received a sentence of 360 to 540 months for bank robbery in case number 23-000235-FC. In case number 23-000233-FC, defendant received a sentence of 360 months to 540 years for bank robbery and 150 to 225 months for armed robbery. All of these sentences are to run concurrently.

On appeal, defendant argues that the evidence was insufficient for the jury to determine that he was the person responsible for the robberies, i.e., the evidence was insufficient to convict him of any of the above-referenced offenses, and that the trial court abused its discretion when it denied defendant's motion in limine to exclude the testimony of the bank teller that identified

defendant as the robber, on the basis that the prosecution improperly suggested that the man sitting next to defense counsel at the preliminary examination would be the individual who robbed her at the bank. We affirm defendant's convictions.

## I. FACTUAL OVERVIEW

## A. PRELIMINARY EXAMINATION

Three witnesses testified at defendant's preliminary examination in January 2023: a teller who was present for the first incident in September 2020 (the first teller), a teller who was present for the second incident in November 2020 (the second teller), and an agent from the Federal Bureau of Investigation (FBI).

The first teller testified that she worked at a bank located at 44th Street and Callendar Road on September 8, 2020. She accepted a bag of money from a person servicing the bank's automated teller machine (ATM), after which she returned to her station and set it on a chair while waiting for her manager to help process the money. In the meantime, she asked if she could help the next person in line. A man then approached and said "this is a robbery. Give me your money." She stood there for a moment because she thought he was joking. He then said, "I'm not going to repeat myself. This is a robbery. Give me your money. Give me that bag behind you." When he started unzipping his jacket, she turned around, gave the robber the bag of money, and he ran out of the bank.

According to the first teller, the robber was wearing a red cap and a blue mask, similar to the kind worn in a hospital. When presented with a photograph marked as People's Exhibit 1, she was able to confirm that it depicted the robber, but she was unable to identify him because in the picture he was likewise wearing the red hat and blue surgical mask that he was wearing during the robbery. On cross-examination, the first teller admitted that she could not recall seeing defendant before that trial day. When asked if defendant was the same person who robbed her, she testified "I cannot recall." She testified that the robber was between 5'8" and 6' tall. She also testified that a black bag fell out of the robber's jacket as he was running out of the bank, and another customer picked up the bag and ran after him. The first teller said that she did not personally see the black bag fall from the robber, but saw it when the customer picked the bag up from the floor, after which the customer waved and called to the robber. The first teller activated the bank's alarm as the robber was running away.

The second teller testified that she was working at a bank located in front of Center Point Mall at the time of the second incident on November 2, 2020. A man approached her window on the teller line and asked if he could ask a question. She initially said no, because she was assisting a customer in the drive-thru, but then indulged him because he said it was a quick question. The man then said, "I have a gun, give me your money." He then stepped back and moved something large and bulky in his pocket. He was wearing a cap, a blue surgical mask, and a bi-colored jacket. She testified: "I sort of froze for a minute, though the bank was very, very full of customers, so I just went ahead and gave him what I had in my drawer, and then he left." When asked about the approximate height of the robber, she said he was "anywhere from 5'7" to 5'11" maybe." She described him as a very dark-skinned man wearing a dark two-tone jack with a zipper, a cap, a blue surgical mask and some gloves. When asked if she was able to identify the man who robbed

her or see him in the courtroom, she said "it'd be a little bit harder because he was wearing a mask, but I do believe it's that gentleman over there." The record reflects that she identified defendant. Defense counsel then asked a series of question regarding discussions the witness had with the prosecutor prior to her testimony.

Q. Okay. Before coming in here today, you were told that the defendant in these robberies would be sitting next to defense lawyer. Yes?

A. Yes, sir.

Q. Okay. And who told you that?

A. The defense attorneys—the—the—the attorney right there. I'm sorry.

Q. The prosecutor?

A. Yes, prosecutor. Thank you, sorry.

Q. I'm sor—okay.

A. Little flustered.

Q. Okay. And I understand. I get it.

A. Mm-hmm.

Q. Who—who told you that the defendant who robbed these banks, or robbed a bank, would be sitting next to me, or be sitting next to a—a defense lawyer today? Who told you that?

A. The prosecutor did, sir.

Q. Okay. You said "the prosecutor."

A. Mm-hmm.

Q. This prosecutor, or—

A. Yes.

Q. —different prosecutor?

A. That one right there, yeah.

Q. Okay. He told you?

A. Mm-hmm.

Q. Is that a yes?

*A.* Yes.

*Q.* What did he say?

*A.* He just told me what to expect when the—when we went in, that, you know, he would be sitting next to you—

*Q.* Okay.

*A.* —and just to prepare me for how everything would go.

Defense counsel subsequently showed the second teller People's Exhibit 1, the photograph identified by the first teller as depicting the person who robbed her. The second teller identified him as the same person who robbed her during the second incident. When asked "[d]o you see him today," she said "Yes. He's right over there." At the close of her testimony, the second teller was asked two additional times if the person who robbed her was in the courtroom today, and she testified that he was.

The last witness to testify at the preliminary examination was an FBI agent. He testified that the security video from the first incident shows the robber leaving the bank when a black object starts to fall out of his jacket. He testified that the bag was recovered from the scene of the first incident and submitted for DNA testing. A lab report was then marked as an exhibit and the agent testified that the report indicated that defendant's and three unrelated unknown contributors' DNA was on the bag. His investigation revealed that defendant was living with a girlfriend who owned a car that matched the description of the vehicle in which the suspect was seen leaving the scene of the crime. The agent also said defendant's girlfriend told that him that defendant used that vehicle. Additionally, the agent testified that, on the morning of the second incident, defendant was involved in a traffic accident, that he recovered bodycam footage from the officer that had contact with defendant at that time, and the license plate information for that vehicle showed that it was registered to defendant's girlfriend, i.e., the Chevrolet car. The agent also testified that a "dark blue or greyish" Chevrolet Traverse that was registered to a different woman, who is now defendant's wife, matched the description of a Chevrolet SUV that a witness saw leaving the scene of the second incident. He said that the surveillance system for the bank in the second incident was not working at that time, but there had been another incident at yet another bank that day (the third incident), November 2, 2020, involving a suspicious person whom the bank manager thought was going to rob the bank and the agent obtained both a still photo and a full video from the third incident. He testified that he reviewed the surveillance camera footage from the first and third incidents, that the jackets worn by the robber in each incident were the same two-tone garment, and he believed that the same person was depicted in each video.

Following the testimony of the agent, the prosecution moved the court to bind defendant over to the circuit court on charges of bank robbery and armed robbery regarding the first incident and bank robbery regarding the second incident. Defense counsel objected to the bind-over without argument. The court then bound defendant over to the circuit court to stand trial on all three charges.

# B. MOTION IN LIMINE

Prior to trial, defendant filed a motion in limine to exclude evidence of the second teller's in-court identification of plaintiff at the preliminary examination because the prosecution employed an overly suggestive procedure that was unnecessary and unreliable.

Defendant argued that the teller was never shown a photo lineup prior to the preliminary examination. Instead, the prosecutor told her, prior to the hearing, that the person who robbed her would be sitting next to defense counsel, meaning that she was "shown only one person," *People v Gray*, 457 Mich 107, 111; 577 NW2d 92 (1998), and she testified that she was only 60% certain that defendant was the person who robbed her. Defendant argued that the Michigan Supreme Court has been critical of identification procedures in which a witness to a crime is shown only one person, as indicated in *People v Sammons*, 505 Mich 31; 949 NW2d 36 (2020), in which the Court stated, "a one-man show up conveys a clear message that the police suspect *this* man." *Id*. at 43 (quotation marks and citation omitted). Defendant further argued that this procedure was unnecessary because the prosecution could have simply shown the second teller the same sample of photographs of suspects that were shown to the first teller and that law enforcement had two years prior to the preliminary examination to show the second teller a photo lineup. Finally, defendant argued that the second teller's identification of defendant was unreliable pursuant to *Neil v Biggers*, 409 US 188; 93 S Ct 375; 34 L Ed 2d 401 (1972), because the factors used by the trial court to evaluate the reliability of a witness did not favor the prosecution.

> [T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

First, defendant argued that the second teller lacked an adequate opportunity to see the robber during the crime because there was a shield on the counter between them and "all the witness saw was the bank robber's general build, skin color and eyes." Second, regarding the witness' degree of attention, the bank was busy, and the witness testified that she froze at the time of the robbery. Third, because the robber was wearing a surgical mask and baseball cap, the witness could not see most of his face or any unique attributes like tattoos or scars, and she estimated his height and weight respectively to be 5'7" to 5'11" and between 150 and 170 pounds, which matched the general description of thousands of people she has helped at the bank. Thus, defendant argued that the accuracy of the witness' description was not a strong indicator of reliability. Fourth, defendant argued that the witness' level of certainty was weak because she said she was only 60% certain about the identification. Fifth, because slightly more than two years passed between the crime and the preliminary examination, the length of time factor was not a strong indicator of reliability.

In response, the prosecution argued that defendant mischaracterized the conversation the prosecutor had with the second teller, which was simply an explanation of what to expect at a preliminary examination. In support, the prosecution noted the FBI agent's testimony that he believed that the prosecutor merely advised them of "the generalities of the courtroom . . . and the setup." In analyzing the *Biggers* factors, the prosecution asserted that the second teller was face-

to-face with the bank robber and that her level of attention is demonstrated, *inter alia*, by the accurate description she provided including the robber's plain blue surgical mask, cap and gloves, a two-tone jacket with a collar and zipper like the ones from a particular brand of coat, as well as her approximation of his height and weight. The prosecution conceded that the witness' certainty was hampered by the COVID mask mandate in place at the time of the robbery, as well as the two years that passed between the robbery and the hearing. But she was able to view a photograph just a few days after the robbery "from a nearby bank of the same person, wearing the same jacket, on the same day of the robbery and she positively identified him as the person who had robbed the bank that day." Upon cross-examination, when shown the photograph from the other bank, the witness again said it was the same man and that she was 80% certain. "Under the applicable totality of the circumstances test," the prosecution argued, the witness' identification "should be admitted at trial for the jury to determine her reliability and credibility."

The parties agree that the trial court denied defendant's motion to exclude the identification testimony by the second teller.[1]

## C. TRIAL

The prosecution called fifteen witnesses to testify at the trial, which took place over the course of four days in January and February 2024.

The first witness called by the prosecution was the first teller, who testified consistent with her testimony at the preliminary examination regarding the bank robbery on September 8, 2020. She was followed by a manager from the bank who testified that that approximately $33,000 was stolen during the first incident. A customer testified that, as she entered the bank that day, she noticed a man who was exiting the bank drop a black bag between the first and second doors (i.e., in the vestibule). She picked up the bag and ran after the man. However, after she was unable to catch him, she left the bag where the man dropped it. She was subsequently interviewed at her house by the police. The customer's son-in-law, who was waiting for her in a car in the parking lot, testified that he saw his mother-in-law exit the bank holding a bag and following a fast-moving person. He saw the man get into a Chevrolet Malibu, which he thought was brown, like coffee. When his mother-in-law returned to the car, he told her to put the bag back; however, when she attempted to do so, the doors were locked, so she left the bag outside of the door. An officer from the Grand Rapids Police Department testified about a security video that was given to police by the bank involved in the first incident, which he said shows the robber putting the bag of ATM money in his coat after which the officer believed the black bag falls out of the robber's coat.[2]

The second teller was called to the stand to testify about the November 2, 2020 robbery, i.e., the second incident. She was asked if the person who robbed her was in the courtroom today and she said he was "sitting in the defendant's chair." She said the amount taken was

---

[1] We note that no written order denying defendant's motion in limine appears in the record.

[2] Clips from the video were played for the jury as the officer testified.

approximately $3,000.[3]  On cross-examination, the second teller agreed that the prosecutor told her that the bank robber would be sitting next to defense counsel.  She was then asked if she was 100% certain that "it was the bank robber," i.e., that the person sitting next to defense counsel was the bank robber, and she said "yes."  When asked why she previously testified she was only 60% sure "it was the robber," she testified that she was confused about the question at the time.  She was asked about this issue again upon redirect examination:

> *Q.* As you sit here today testifying in court in front of this jury, the individual that robbed you back on November 2, 20220, is he in the courtroom?
>
> *A.* Yes.  He's sitting at the defendant's table in a white shirt.
>
> *Q.* Do you have any reservations about saying that?
>
> *A.* Absolutely none.

When asked by defense counsel on recross-examination to confirm that, prior to the preliminary examination, the prosecutor told her that "the person responsible for robbing the banks" would be sitting next to his lawyer, she testified, "[h]e said that the defendant—where he would be sitting in relation to everyone else."  When asked to clarify, she said "I said that he said that's where the defendant was going to be sitting.  He didn't necessarily say, you know, that's where the person that robbed you is going to be sitting.  He just indicated where the defendant's table was."

A bank manager involved in the third incident testified that, on November 2, 2020, a person wearing a "glittery" mask and gloves came in asking some strange questions about his brother's account and would not provide his identification when asked.  She described him as an adult African-American maybe 5'6" to 5'7" in height.  After a large maintenance man approached to speak to the manager, the man appeared to get nervous and left the bank.  She saw that he left in a dark gray Chevrolet Equinox or similar vehicle.  She said representatives from the bank then sent video concerning the incident to the FBI.

Another officer from the Grand Rapids Police Department testified about responding to a motor vehicle accident on the morning of November 2, 2020.  He testified that defendant was one of the drivers involved in the accident and that he was operating a tan or gold Chevrolet Impala.

Yet another bank manager testified about an incident that occurred at a bank located on Alpine Avenue in Grand Rapids on January 29, 2021.  On that date, a man walked into the branch, told her he was there to rob the bank, and said he had a gun and would shoot everyone there.  She escaped by entering a locked room and pushing the robber away as she entered, after which he left.  She was shown a picture of the robber with a mask, sunglasses and stocking cap, and said he was the man who tried to rob her.  Another employee at the bank on Alpine Avenue then testified that

---

[3] A manager for the bank that was robbed in the second incident testified that approximately $3,400 was stolen.

he saw the robber get into a car afterwards, which he described as a tan or gold Chevrolet-type vehicle with a dent above the rear tire.

A teller who worked at another bank, located in Kalamazoo, testified about another incident that occurred on January 29, 2021. A man walked in wearing a mask, black sunglasses, yellow beanie, a hoodie and blue gloves. He said "this is a robbery. Give me all the cash that you have in your drawer." Pursuant to his demands, she gave him all of the money in her drawer and the money from the next drawer over, after which he left. She could not describe the robber. She said he stole about $3,000.

A former girlfriend of defendant testified that they were dating at the end of 2020 through early 2021, at which time she owned a gold Chevrolet Impala. She said defendant used the vehicle during that time. She said that defendant gave her cash, which he said came from his other girlfriend (now wife). She said the FBI showed her pictures of the robber, but that she could not identify him or his clothes. Her testimony suggests that she could not identify the person because they were "masked up, wearing a hat."

The prosecution next called a forensic scientist who testified that she received swabs from the black bag that were compared to a buccal swab procured from defendant. She interpreted the DNA found on the black bag to have come from four individuals, at least one of which was male, and that the DNA originated from defendant and three unrelated unknown individuals. She testified that "the results of that analysis were that based on the DNA profile that was obtained from the black-bag swabs and [it] is at least or approximately 234,000,000,000 times more likely if it originated from Mr. Muzamhindo and three unrelated, unknown individuals than if it originated from four unrelated, unknown individuals." As a result, she said the analysis provided very strong support that defendant was a contributor to the DNA from the black-bag swabs.

The prosecution's last witness was the FBI agent, who testified consistent with his testimony at the preliminary examination, except that he added testimony about a search he conducted of defendant's cell phone. The phone's search engines included multiple searches for "banks by me" and "bank robbery in Grand Rapids."

Defendant called no witnesses at trial.

After more than three hours of deliberations, the jury found defendant guilty on all three counts.

## II. SUFFICIENCY OF THE EVIDENCE

Defendant argues that his constitutional right to due process of law, under both the Fourteenth Amendment and Article 1, § 17, of Michigan's 1963 Constitution, was violated because the evidence of his identity as the person who robbed the two banks was legally insufficient to sustain his convictions. We disagree.

A challenge to the legal sufficiency of the evidence is reviewed de novo on appeal. *People v Henry*, 315 Mich App 130, 135; 889 NW2d 1 (2016). Michigan's due process clause provides that "[n]o person shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty or property, without due process of law." Const 1963, art 1, § 17. The

due process clause of the Fourteenth Amendment guarantees that "no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." *Jackson v Virginia*, 443 US 307, 316; 99 S Ct 2781; 61 L Ed 2d 560 (1979).[4] "In determining whether the prosecutor has presented sufficient evidence to sustain a conviction, an appellate court is required to take the evidence in the light most favorable to the prosecutor." *People v Tennyson*, 487 Mich 730, 735; 790 NW2d 354 (2010). "[T]he question on appeal is whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *People v Hardiman*, 466 Mich 417, 421; 646 NW2d 158 (2002). This Court "is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000). "It is a fundamental principle of our system of justice that an accused's guilt must be proved beyond a reasonable doubt to sustain a conviction." *People v Prude*, 513 Mich 377, 384; 15 NW3d 249 (2024) (quotation marks and citation omitted). "Accordingly, a conviction that is not supported by sufficient evidence to prove guilt beyond a reasonable doubt violates due process and cannot stand." *Id.*, citing US Const, Ams V and XIV; Const 1963, art 1, § 17. There is sufficient evidence for a guilty verdict when "a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *Tennyson*, 487 Mich at 735 (quotation marks and citation omitted).

"The prosecution need not negate every reasonable theory of innocence; instead, it need only prove the elements of the crime in the face of whatever contradictory evidence is provided by the defendant." *People v Mikulen*, 324 Mich App 14, 20; 919 NW2d 454 (2018). "Circumstantial evidence and the reasonable inferences that arise from such evidence can constitute satisfactory proof of the elements of a crime." *Id.* All conflicts in the evidence are resolved in the prosecution's favor. *Id.* See also *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008). "It is for the trier of fact, not the appellate court, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002).

In this case, defendant was charged with two counts of bank robbery in violation of MCL 750.531, which provides:

> Any person who, with intent to commit the crime of larceny, or any felony, shall confine, maim, injure or wound, or attempt, or threaten to confine, kill, maim, injure or wound, or shall put in fear any person for the purpose of stealing from any building, bank, safe or other depository of money, bond or other valuables, or shall by intimidation, fear or threats compel, or attempt to compel any person to disclose or surrender the means of opening any building, bank, safe, vault or other depository of money, bonds, or other valuables, or shall attempt to break, burn,

---

[4] "Although this Court is not bound by federal precedent interpreting the Fourteenth Amendment's Due Process Clause when interpreting the Michigan Constitution's Due Process Clause, because the two clauses are textually similar, we may still find United States Supreme Court precedent interpreting the federal Due Process Clause persuasive." *People v Loew*, 514 Mich 158, 185 n 13; 22 NW3d 323 (2024).

blow up or otherwise injure or destroy any safe, vault or other depository of money, bonds or other valuables in any building or place, shall, whether he succeeds or fails in the perpetration of such larceny or felony, be guilty of a felony, punishable by imprisonment in the state prison for life or any term of years.

Additionally, he was charged with armed robbery in violation of MCL 750.529:

> (1) A person who engages in conduct proscribed under section 530 and who in the course of engaging in that conduct does any of the following is guilty of armed robbery:

> (a) Possesses a dangerous weapon.

> (b) Possesses an article used or fashioned in a manner that would cause a reasonable person to believe the article is a dangerous weapon.

> (c) Represents orally or otherwise that he or she possesses a dangerous weapon.

> (2) A person who violates this section is guilty of a felony punishable by imprisonment for life or for any term of years.

> (3) If a violation of this section results in an aggravated assault of or serious injury to any other person, the person must be sentenced to a minimum term of imprisonment of not less than 2 years.

Section 530, referenced at the outset of the foregoing statute, sets forth the offense of robbery:

> (1) A person who, in the course of committing a larceny of any money or other property that may be the subject of larceny, uses force or violence against any person who is present, or who assaults or puts the person in fear, is guilty of a felony punishable by imprisonment for not more than 15 years.

> (2) As used in this section, "in the course of committing a larceny" includes acts that occur in an attempt to commit the larceny, or during commission of the larceny, or in flight or attempted flight after the commission of the larceny, or in an attempt to retain possession of the property. [MCL 750.530.]

There was sufficient evidence for a reasonable juror to find beyond a reasonable doubt that defendant committed the two counts of bank robbery. DNA that was found on the black bag dropped by the robber during the first incident was 234 billion times more likely to have come from defendant and three unknown individuals than to have come from a group of four individuals that did not include defendant, meaning that defendant almost certainly had touched the bag found at the scene of the first incident. His cell phone was found to contain searches for banks nearby, as well as searches regarding bank robberies in Grand Rapids. The teller from the second robbery testified that she was 100% certain that he was the robber. The description of the robber's attire provided by the teller as well as his appearance in the security video from the first incident, match the description given by the teller in the second incident. That evidence, when considered

-10-

alongside of the second teller's court-room identification of defendant, suggest that both robberies were conducted by the same person and that defendant was that person. A witness saw the robber driving a car that matched the description of his girlfriend's Chevrolet, that same girlfriend testified that he had use her car, and defendant was found to be operating that Chevrolet during the traffic accident on November 2, 2020. A witness also testified that the robber in the second incident was driving a Chevrolet SUV that matched the vehicle of his other girlfriend (now wife). Multiple witnesses also provided testimony indicating that the robber's approximate height and weight matched that of defendant. Considering all of this evidence in the light most favorable to the prosecution, a reasonable juror could believe that defendant was the person who "put in fear" both the first and second teller for the purpose of stealing money from their respective banks; that defendant, by intimidation, fear or threats, compelled those tellers to surrender the money, or both. MCL 750.531.

There was likewise sufficient evidence for a reasonable juror to find beyond a reasonable doubt that defendant committed armed robbery in the first incident. Again, the first teller testified that the robber told her, "I have a gun, give me your money." When this additional victim testimony is considered alongside the above-referenced evidence, there was sufficient evidence for the jury to find defendant violated MCL 750.529(1)(c) beyond a reasonable doubt.[5]

Defendant argues that no one identified defendant as a robber prior to trial, and he asserts the prosecution's procedure for doing so at trial was overly suggestive and unreliable under *Biggers*. We first note that the second teller identified defendant at the preliminary examination, i.e., before trial. The Michigan Supreme Court addressed the issue of identifying a defendant for the first time at trial in *People v Posey*, 512 Mich 317, 339-340; 1 NW3d 101 (2023):

> [W]e hold that evidence of an unnecessary first-time-in-court identification procured by the prosecution—a state actor—implicates a defendant's due-process rights in the same manner as an in-court identification that is tainted by an unduly suggestive out-of-court identification procedure employed by the police. Because the same due-process rights are affected, trial courts must consider reliability factors such as those at issue when an in-court identification is tainted by an unduly suggestive out-of-court identification procedure.

Defendant argues that the procedure used by the prosecution in this matter was unduly suggestive because the prosecutor told the second teller that the person who robbed her would be sitting next to defense counsel. However, the trial testimony of the second teller contradicts that assertion. As noted above, when cross-examined at trial on that issue, the second teller explained that "[h]e didn't necessarily say, you know, that's where the person that robbed you is going to be sitting. He just indicated where the defendant's table was."

Even if identification by the second teller at the preliminary examination was unnecessarily suggestive, reversal would not be required here because the error was harmless beyond a

---

[5] We note that, on appeal, defendant disputes that the evidence was sufficient to prove that he was the person who committed the robberies, but does not dispute the sentencing enhancement for habitual offender fourth offense. MCL 769.12(1).

reasonable doubt. See *Sammons*, 505 Mich at 56. There was an overwhelming amount of evidence indicating that defendant was the robber, even without the identification testimony of the second teller, which again included very strong DNA evidence, the fact that the robber was seen leaving multiple bank robberies in a car matching the description of two different Chevrolets belonging to two different girlfriends of defendant, one of which he indisputably drove, the searches on defendant's phone for banks nearby and bank robberies in Grand Rapids, and the fact that he matched the description of the robber given by multiple witnesses.

### III. MOTION TO STRIKE WITNESS TESTIMONY

Defendant next argues that the trial court erred by denying his motion in limine to strike evidence of the first teller's identification of defendant.

"The decision whether to admit evidence is within a trial court's discretion." *People v Katt*, 468 Mich 272, 278; 662 NW2d 12 (2003). "A trial court abuses its discretion when it selects an outcome that does not fall within the range of reasonable and principled outcomes." *People v Young*, 276 Mich App 446, 448; 740 NW2d 347 (2007).

The trial court conducted a hearing on plaintiff's motion in November 2023. Although no order was filed in the lower court, the parties agree that the court denied the motion. But defendant has not produced a copy of the hearing transcript, meaning there is no record on appeal of the trial court's reasoning on that issue. "Defendant is responsible for providing us a transcript, MCR 7.210(B)(1), and we generally refuse to consider issues for which an appellant has failed to do so . . . ." *People v Dunigan*, 299 Mich App 579, 587-588; 831 NW2d 243 (2013), citing *PT Today, Inc v Comm'r of Fin & Ins Servs*, 270 Mich App 110, 151-152; 715 NW2d 398 (2006). As a result, we decline to address this issue.

Affirmed.

/s/ Colleen A. O'Brien
/s/ Kathleen A. Feeney
/s/ Randy J. Wallace